IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36694-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMBROSIO MENDEZ VILLANUEVA, | ) | UNPUBLISHED OPINION |
| and JULIO CESAR ALBARRAN-VARONA, | ) | |
| VARONA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| GUSTAVO TAPIA RODRIGUEZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Gustavo Tapia Rodriguez (Tapia) appeals his conviction and life sentence for aggravated first degree murder. We affirm, but remand to the trial court to strike "Felony Murder" from the current offenses paragraph of the judgment.

No. 36694-4-III
*State v. Rodriguez*

FACTS

Tapia was the self-appointed leader of a group of men involved in vandalism, drugs, and murder. He, along with his cohorts—Chato[1], Zapatos[2], Julio[3], and Chivo[4]—lived at the Shady Tree RV Park near George, Washington. Chato was romantically involved with the victim, Jill Sundberg.

On the evening of December 21, 2016, Chato and Jill, along with several others, were in Chato's trailer drinking and using illegal drugs. Later in the evening, Tapia, Julio, Zapatos and Chivo joined the party. Because the trailer was fairly small, several people left, leaving just Tapia, Jill, Chato, Chivo, Julio, and Zapatos.

Around midnight, Jill and Tapia began arguing in English. Because no one else in the trailer spoke English, the substance of the argument was unknown. However, Tapia later told his cohorts that Jill had disrespected his family and was possibly working with law enforcement to bring him down. When Tapia left the trailer with Chato, Chivo, and Zapatos, he ordered Julio to remain with Jill in the trailer and to not let her leave.

---

[1] Salvador Espinoza Gomez

[2] Fernando Marcos Gutierrez

[3] Julio Cesar Albarran-Varona

[4] Ambrosio Mendez Villanueva

2

Later, at Tapia's direction, Chivo and Zapatos returned to the trailer to get Jill and put her in Tapia's sport utility vehicle (SUV). When Jill realized what was happening, she attempted to resist by pulling out a knife. In response, Zapatos pulled out a gun and was going to shoot Jill, but Julio stopped him because he did not want the neighbors to hear the gunshot. Julio and Zapatos took Jill's knife and cell phone and forced her into the backseat of Tapia's SUV.

With Tapia driving and Jill crying in the back seat, the group left the RV park. Jill had no ability to escape—she was sandwiched between three men in the backseat and Zapatos had tied her hands together with a cell phone cord. Tapia drove west on Interstate 90, turning off on a road near the Old Vantage Highway that led down to the river. When Tapia stopped at a dark parking area, Chivo and Julio forced Jill out of the SUV. Jill asked "why?" but Julio told her to stay quiet. Report of Proceedings (RP) (Feb. 5, 2019) at 1062. Jill was then forced to kneel and Julio pushed her head down. Tapia then shot Jill in her head and back, emptying the entire magazine of his gun. The group returned to the SUV and began driving away but stopped briefly to allow Chivo to run back to Jill's body with a cardboard box. Chivo then affixed the box to Jill's body by stabbing a knife through it and into her back. There was a message written in Spanish on the box. Translated to English, it read, "'This is for all the rats that are f[ ]ing around,

3

women and rats that have no respect for the Gulf Cartel.'" RP (Feb. 13, 2019) at 1797-98.

On the way back to Shady Tree, the men stopped at a convenience store in Quincy where Zapatos and Julio bought beer and cigarettes. Once at Shady Tree, they grabbed Jill's belongings and drove to the Vantage Bridge where they threw them over the bridge into the river. The group returned to Shady Tree where some of them slept for a few hours. Around 11:00 a.m., the group (with the exception of Zapatos) drove to Ephrata to buy ammunition and then drove to an apple orchard near Mattawa to practice shooting.

On December 22, 2016, a hiker found Jill's body. Near her body, police recovered 13 shell casings. Investigators also recovered a Bud Light can. Forensic testing found Chato's DNA[5] on the can.

*Investigation*

Those close to Jill told the investigators she was living or spending a lot of time at Shady Tree RV Park. Accordingly, investigators focused their investigation on residents of Shady Tree and anyone who had seen Jill on the night of December 21, 2016. Destiny Jade Rivera and Leslie Silva Diaz were both interviewed and said they were at Chato's trailer on December 21, 2016. While they were there, they also saw Jill, Tapia, Zapatos,

---

[5] Deoxyribonucleic acid.

4

and Julio. Investigators also interviewed Chato, who had been taken into custody on unrelated charges.

*Chato*

After Chato was read his *Miranda*[6] rights, he gave a full and complete statement of the events leading up to and after Jill's murder. Chato implicated Tapia as the shooter and Julio, Chivo, and Zapatos as assisting with the murder. Chato denied any involvement in Jill's abduction. Rather, he said he had refused to help get Jill into Tapia's SUV and, although he was forced to go with the men, he did not watch Tapia actually shoot Jill. Chato's trial testimony matched this statement.

*Arrest Warrants and Witness Statements*

Based on information obtained during these and other interviews, the State obtained arrest warrants and statements from Tapia, Chivo, and Julio.

*Tapia*

Tapia waived his *Miranda* rights and willingly answered the investigator's questions. He said he knew Jill but had not seen her for months. He also said that on the evening of December 21, 2016, he went to Chato's trailer to discuss Chato moving but did not go into the trailer and did not see Jill at the trailer. Throughout the interview,

---

[6] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Tapia denied taking part in Jill's murder. Tapia told investigators that Julio and Zapatos frequently borrowed his SUV, often without permission. Tapia did not testify at trial.

*Chivo*

Chivo gave a written statement to investigators under penalty of perjury. The following are excerpts from Chivo's statement, which was later admitted at trial: Chivo lived with Tapia, Zapatos, and Julio at the Shady Tree RV Park. On December 21, 2016, Tapia got in an argument with Jill but it was in English, so he could not understand what was being said. He left the trailer but soon was told to get into Tapia's SUV with Jill, Tapia, Chato, Julio, and Zapatos. Tapia drove to an area where no one was around. Julio forced Jill out of the SUV and then Tapia shot her. He heard three to four shots. Just after they began to leave, Tapia told him to grab a cardboard box with writing on it and to place it on Jill. So he took a knife and stabbed the box into Jill's back to hold it in place. After this, they went to Quincy to buy beer at a gas station. When asked about the box he stabbed into Jill's back, Chivo said he did not want to be part of the murder, but Tapia told him if he did not help, he would be "left out to sleep like Jill." Ex. 163. Chivo did not know what happened to the gun that was used to kill Jill although he did hide a different gun for Tapia in his toilet. He did not previously say anything to law enforcement because he was scared.

6

Chivo could not read or write. He gave Detective Ryan Green permission to type the statement. Deputy David Delarosa, who was translating for Chivo during the interview, read the written statement to Chivo and gave Chivo the opportunity to make any changes before Chivo signed it under penalty of perjury.

Several months later, an investigator hired by defense counsel interviewed Chivo. Chivo recanted the events and information as detailed in his sworn statement. Chivo told the investigator that his previous statement was a lie and that he had no part in Jill's murder and did not have any information about Jill's murder.

*Julio*

Julio denied hurting Jill, denied being present at her murder, and denied knowing who killed Jill. One year later, Julio gave another statement. The second statement, termed a free talk, was provided as part of a plea agreement. During the free talk, Julio provided a thorough description of the events surrounding Jill's murder that was consistent with the events as described by Chato and by Chivo.

*Physical and Circumstantial Evidence*

As the investigation continued, significant physical and circumstantial evidence corroborated the statements of Chato, Chivo, and Julio. Investigators found the murder weapon in Julio's backpack at the trailer where he was living. Investigators also obtained

surveillance tapes from the gas station in Quincy showing Julio and Zapatos entering the

convenience store and purchasing beer and cigarettes at a time consistent with witness

statements. Additionally, after obtaining call detail records from AT&T through a search

warrant, investigators used a private company to plot location data of the group's cell

phones around the time of Jill's murder.

The location data showed Tapia's cell phone and the cell phones of Chato, Julio,

and Zapatos[7] moving from Shady Tree, to the location of Jill's execution, to the

convenience store in Quincy, and to the orchard near Mattawa—all locations consistent

with the three witness statements. From the location data, investigators were also able to

locate the exact orchard clearing where the men went shooting. There, investigators

recovered several shell casings. One of the shell casings was forensically matched to the

gun used to kill Jill.

By amended information, the State charged Tapia with two counts. The first count

alleged murder in the first degree with the alternative means of premeditation or felony

murder predicated on kidnapping. The State additionally alleged that the premeditated

murder should be elevated to aggravated murder because it occurred during the course of

_____

[7] Chivo's provider was Verizon, not AT&T, and it does not appear that call detail
records were requested from Verizon. Therefore, there is no evidence as to the location
of Chivo's cell phone.

a drive-by shooting (RCW 10.95.020(7)) or during the course of first degree kidnapping (RCW 10.95.020(11)(d)).  Also, with respect to the first count, the State alleged the deliberate cruelty aggravator (RCW 9.94A.535(3)(a)) and a firearm enhancement.  The second count alleged unlawful possession of a firearm in the second degree.

*Pretrial Motions*

Tapia brought a motion in limine to exclude any evidence related to gangs or cartels.  The State responded that no evidence of gangs would be presented except the translation of the words on the cardboard box affixed to Jill.  Tapia's counsel agreed.

Tapia also brought a motion to prevent the State from presenting any evidence or testimony related to the AT&T NELOS (Network Event Location System) cell phone records.  In the motion, defense counsel differentiated between (1) call detail records, (2) the NELOS records.  Counsel also attempted to differentiate between (A) the NELOS data related to the cell phone of Tapia and (B) the NELOS data related to the cell phones of Chato, Julio, and Zapatos.  Defense counsel said, "[W]e have no objection to the call detail records.  We have objections to the NELOS records.  We believe the call detail records are based upon science and there's no problem with that."  RP (Jan. 30, 2019) at 403.  Later, defense counsel said, "We have no objection, also, to the NELOS records of the four other people implicated in this case.  We do have an objection to the NELOS

records pertaining to my client, the admissibility." RP (Feb. 5, 2019) at 922. After

hearing argument, the court denied the motion without prejudice explaining it did not

have enough information to rule and would wait until the experts testified.

On the second day of jury selection, Tapia moved for a change of venue based on

two recent articles in separate local newspapers. The parties agreed to continue the

motion to see whether an impartial jury could be selected. Through that and the next day

of jury selection, potential jurors who had heard of the case were questioned individually,

and, with one exception, those who had read one or both recent articles were removed for

cause. The one not removed could not recall any details from the article. Once a jury was

selected, Tapia renewed his motion. The trial court denied the motion based on the

success of seating jurors who had not read the recent articles.

*Trial*

*Summary of defense strategy*. At trial, defense counsel focused on casting doubt

on Tapia's involvement in Jill's death. Defense highlighted the lack of physical evidence

tying Tapia to the gun that killed Jill or the scene of the crime. Defense counsel also

focused on attacking the credibility of the State's key witnesses by highlighting

inconsistent testimony and motives to lie. Specifically, defense counsel emphasized that

Julio completely changed his statement, but only after receiving a plea deal from the State

with significantly reduced charges and shorter sentence.  And, although Chato's version

of events never changed, defense counsel argued that Chato had a motive to lie because

the State promised to drop all related and unrelated charges against him in exchange for

testifying against Tapia.

Defense counsel even offered the jury a plausible explanation for Jill's murder.

Through testimony, he highlighted the fact that Chivo and Zapatos sold drugs, as did Jill,

and argued that competition in the drug business is a motive for murder.

*Summary of the trial proceedings*.  At trial, the State presented many witnesses

placing Tapia with Jill in Chato's trailer on the night of December 21, 2016.  Destiny Jade

Rivera and Leslie Silva Diaz both testified seeing Jill and Tapia in Chato's trailer with

them on the night of December 21, 2016.

The State also presented witnesses detailing the events as set forth above.  Chato's

testimony at trial was consistent with his police interview statement.  Julio's testimony at

trial was consistent with his second statement, fully detailing Jill's murder.  Julio testified

that it was Tapia who decided to kill Jill and it was Tapia who shot Jill.  Julio also

testified that after the murder, Tapia gave Zapatos the gun used to kill Jill.  However,

Julio thought Zapatos was not being sufficiently careful.  So Julio eventually took the gun

from Zapatos and hid it in his backpack where investigators found it after he was arrested.

During cross-examination, defense counsel effectively demonstrated that Julio's testimony had changed drastically from his initial statement.

At trial, Chivo testified that he was offered a plea agreement in return for his testimony, but he refused the agreement because he "didn't want to be a witness." RP (Feb. 11, 2019) at 1426. During the rest of his testimony at trial, Chivo was uncooperative, claiming a lack of memory as to both his 2017 and 2018 statements. During direct examination and cross-examination, Chivo repeatedly answered, "I don't remember." RP (Feb. 11, 2019) at 1419-41. However, the lack of memory was sporadic and selective. For example, Chivo testified that he remembered giving and signing the January 23, 2017 statement but did not think that it accurately reflected his memory at the time. Chivo testified that he remembered living at Shady Tree but did not remember the names of the people he lived with. He testified he did not remember anyone named Jill, did not remember going with friends to the Vantage area early in the morning of December 21, 2016, but did remember putting a cardboard sign on "the back" with a knife. RP (Feb. 11, 2019) at 1420. Chivo testified that he knew men named Zapatos and Chato, but did not remember if they lived with him in Tapia's trailer.

Based on Chivo's failure to testify or cooperate, the State sought to admit his earlier sworn statement under ER 801(d)(1) as a *Smith*[8] affidavit. The court excused the jury and heard argument. After, the court made multiple findings. First, it found that Chivo's courtroom testimony was clearly inconsistent with his previous statement given to police. Second, it found that Chivo was not coerced into making the prior statement, but instead, made the statement voluntarily. Third, it found that the statement was made as part of a police investigation under penalty of perjury and that minimal guarantees of truthfulness existed. Specifically, both the interviewing detective and the translating officer testified as to the making of the statement and the processes undertaken to ensure that the written statement accurately reflected Chivo's recollection of the events and ensuring that Chivo understood the meaning of perjury before signing the document. Fourth, the court found that Chivo was subject to cross-examination. Because the trial court found each element of ER 801(d)(1) satisfied, the trial court allowed Chivo's previous sworn statement to be entered as substantive evidence.

The State also sought to introduce cell phone location evidence. Detective Kyle Cox provided some evidence of the trustworthiness of cell phone location technology. He testified that several witnesses described going to an orchard near Mattawa for shooting

---

[8] *State v. Smith*, 97 Wn.2d 856, 859-61, 651 P.2d 207 (1982).

13

practice after Jill was killed, but law enforcement could not locate the area. It was only after receiving and analyzing the cell phone location data that investigators were able to locate the orchard and the clearing.

The State, through AT&T records custodian Carmela Caravello, began laying additional foundation for admission of the NELOS records. Defense counsel renewed his objection. After hearing additional argument on the issue, the court partially denied the motion admitting into evidence as business records the cell phone records including the NELOS data for everyone except Tapia. The court reserved its ruling on the admission of Tapia's NELOS records until the State's NELOS expert testified.

Before the State's NELOS expert, Michael Fegely, testified, defense counsel again renewed the objection. The court allowed extensive argument and an offer of proof through Fegely, with both parties asking several questions. Defense counsel argued that the NELOS technology was not accurate and likened the State's demonstrative exhibit—a graphic map showing cell phone movement over time—to a commercial.

The State acknowledged that the cell phone location data was not precise, yet was relevant because the data gave an approximate location of each cell phone throughout a period of time. The State explained that the graphic map was merely a summary of Fegely's testimony and because it showed each phone number in a different color, the

data was easier to understand. The State argued that even though the cell phone location information was not precise, the general location of the cell phones was sufficiently accurate to be helpful to the jury. The State also argued that the data should not be excluded because Tapia had his own NELOS experts, could attack the accuracy of the technology during cross-examination, and could present his own visual aid.

The court agreed. It denied Tapia's motion to exclude the NELOS records, admitted the NELOS records into evidence, and allowed the jury to view the graphic map for illustrative purposes.

Fegely testified at length. Through use of the graphic map, he demonstrated that the general locations of the cell phones tracked the events as described in the witness statements and the physical evidence. The cell phone data showed the cell phones of Tapia, Chato, Julio, and Zapato in the vicinity of Shady Tree at the time Chato, Chivo, and Julio said they were partying at Chato's trailer with Jill and Tapia. The data also showed the cell phones moving to the vicinity of the Old Vantage Highway where Jill was murdered at the approximate time noted by the witnesses. The cell phones then moved to Quincy, which further corroborated the witnesses' statements, and hours later to the orchard clearing in Mattawa where the shell casings were found.

During cross-examination, defense counsel established that the technology did not permit one to know a precise location, but only an estimate. Defense counsel also demonstrated some inconsistencies between the time stamps on the NELOS records with known travel times between places.

As for the physical evidence, a firearm forensic expert testified that one of the shell casings found at the orchard matched the shell casings found near Jill's body and was fired from the murder weapon. A forensic scientist testified about DNA found on various items, including the murder weapon and a beer can found at the orchard clearing. During cross-examination, this second expert admitted that Tapia's DNA was not found on the gun or any other item tested.

*Jury, Judgment and Sentence*

The jury found Tapia guilty of first degree murder by both alternative means— premeditated first degree murder, and felony murder predicated upon kidnapping. It also found him guilty of unlawful possession of a firearm in the second degree. It additionally found that the State had proved the firearm enhancement and all aggravators alleged.

The trial court sentenced Tapia to life without the possibility of parole (LWOP) for aggravated first degree murder, plus 60 months for the firearm enhancement. It also sentenced Tapia to 12 months, concurrent, for unlawful possession of a firearm in the

second degree. It did not (redundantly) increase Tapia's LWOP sentence due to the deliberate cruelty aggravator.

Tapia timely appealed.

ANALYSIS

We discern eight general arguments raised by Tapia. We address them in the order raised.

1.      DOUBLE JEOPARDY

Tapia argues the trial court violated his constitutional right against double jeopardy when it entered two convictions for first degree murder. The State responds the trial court entered only one conviction for first degree murder, so double jeopardy principles do not apply.

The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution protect against multiple convictions for the same offense and multiple punishments for the same offense. *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980).

Here, the judgment and sentence lists two current offenses: count 1 and count 2. Count 1 lists the murder in the first degree conviction, while count 2 lists the unlawful possession of a firearm in the second degree conviction.

With respect to count 1, the entries read in part: "Murder In The First Degree (Felony Murder/Premeditated)." Clerk's Papers (CP) at 1264. We construe this entry as a singular murder conviction. However, to remove any ambiguity, we accept the State's offer to direct the trial court to strike "Felony Murder." *See, e.g.*, *State v. Trujillo*, 112 Wn. App. 390, 411, 49 P.3d 935 (2002) (explaining when a jury returns a verdict of guilty on each alternative charge, the court should enter a judgment on the greater offense only and sentence the defendant on that charge without reference to the verdict on the lesser offense). Our direction to the trial court to strike "Felony Murder" moots any alleged issues of double jeopardy and Tapia's related merger argument.

2. SUFFICIENCY OF EVIDENCE FOR KIDNAPPING AGGRAVATOR

Tapia, citing *State v. Green*, 94 Wn.2d 216, 228-29, 616 P.2d 628 (1980) (plurality opinion), argues there was insufficient evidence of kidnapping in the first degree. In *Green*, the court acknowledged that kidnapping requires proof that the victim was restrained by the use of deadly force. The *Green* court explained that although a "fatal wound is the ultimate form of 'restraint' because it obviously 'restrict[s] a person's movement,'" the killing itself cannot establish the restraint by means of deadly force element. *Green*, 94 Wn.2d at 229 (alterations in original). Otherwise, "*every* intentional killing would also be a kidnapping because the killing itself would supply the requisite

18

'restraint' . . . [and m]oreover, *every* intentional killing would *automatically*" be converted into aggravated murder in the first degree. *Id.* (alterations in original).

When an appellant challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* This court's role is not to reweigh the evidence and substitute its judgment for that of the jury. *Green*, 94 Wn.2d at 221. Instead, because the jurors observed testimony firsthand, this court defers to the jury's decision regarding the persuasiveness and the appropriate weight to be given the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Kidnapping in the first degree includes an intentional abduction with intent to facilitate the commission of any felony or flight thereafter. RCW 9A.40.020(1)(b). "Abduct" includes restraining a person by use or threat of use of deadly force. RCW 9A.40.010(1)(b). "Restraint" means to restrict a person's movements without consent in a way that substantially interferes with his or her liberty. RCW 9A.40.010(6).

Viewing the evidence in the light most favorable to the State, the jury had

sufficient evidence to find beyond a reasonable doubt that first degree kidnapping had

occurred. Contrary to Tapia's assertions, the jury did not rely on the killing of Jill to find

the requisite "restraint by use of deadly force." Rather, the State presented evidence that

before shooting Jill, Tapia instructed Chivo and Zapatos to put Jill in his SUV. When Jill

resisted by pulling a knife, Zapatos pulled a gun and would have shot her had Julio not

stopped him. The two men disarmed Jill and forced her into Tapia's SUV. Jill was

forced to sit in the backseat between Chivo and Julio with her hands tied. Based on the

facts presented, a jury could find that the abduction and transporting of Jill by gunpoint

established the requisite restraint by deadly force. Accordingly, there was sufficient

evidence for a jury to find the kidnapping aggravator proved beyond a reasonable doubt.

3.    EFFECTIVE ASSISTANCE OF COUNSEL

Tapia argues that his counsel was ineffective on several instances. After

addressing the applicable legal standards, we address Tapia's arguments in the order

presented.

This court reviews claims of ineffective assistance of counsel de novo. *State v.*

*Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). A defendant claiming ineffective

assistance of counsel has the burden to establish that (1) defense counsel's representation

20

was deficient, and (2) the performance prejudiced the defendant's case. *Strickland v.*

*Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to

establish either prong is fatal to an ineffective assistance of counsel claim. *Id.* at 700.

Counsel's performance is deficient if it falls below an objective standard of

reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our

scrutiny of counsel's performance is highly deferential; we strongly presume performance

was reasonable. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Where the

alleged deficient conduct of defense counsel is the failure to bring a motion, the appellant

can establish prejudice only if the motion would have been granted. *State v. Price*, 127

Wn. App. 193, 203, 110 P.3d 1171 (2005).

　　　　　*a.　　　Deputy as an interpreter*

Tapia argues his trial counsel was deficient for not moving to suppress the

statements given by Julio, Chivo, and Chato. He argues none of them could speak

English and the deputy translator was not independent, so there is no guarantee that the

three understood and waived their constitutional rights, nor is there any guarantee that the

translations were accurate. In support of his arguments, he relies on *State v. Cervante*s,

62 Wn. App. 695, 699-700, 814 P.2d 1232 (1991).

21

We initially note that the three interviews were recorded, so Tapia had the opportunity, prior to trial, to move to suppress if there was evidence the translations were inaccurate. There is no evidence any of the translations were inaccurate and, on this basis alone, we might dispose of Tapia's purely conjectural arguments. However, we elect to address Tapia's arguments.

*Cervantes* does not support Tapia's arguments. *Cervantes* involved the use of a potential codefendant to translate both *Miranda* warnings to Cervantes and the officer's questions and Cervantes's answers to incriminating questions. *Id.* at 697-99. The *Cervantes* court cited cases noting that codefendants have an obvious bias and risk falsely implicating the monolingual speaker. *Id.* at 699-701. Unsurprisingly, the court held that Cervantes's statements should have been suppressed because the officer's use of a potential codefendant as a translator was fundamentally unfair and violated due process. *Id.* at 701.

Unlike the potential codefendant in *Cervantes*, the potential codefendants here did not translate for Tapia. Rather, they made statements implicating Tapia and others in Jill's killing. In addition, the translating deputy had a motive to accurately translate. He knew the interviews were being recorded and any incorrect translation could later be challenged. In addition, the translating deputy had no motive to implicate one potential

codefendant, such as Tapia, over any other. Although Tapia's cohorts may have had a motive to implicate Tapia, that motive was thoroughly exposed during cross-examination and argued to the jury. We see nothing unfair about a law enforcement officer translating for potential codefendants when the translations are recorded and are subject to verification by the defendant. A motion to exclude the three statements by defense counsel would have been unsuccessful. Defense counsel's failure to bring such a motion does not constitute ineffective assistance of counsel.

### b. Purported juror bias

Tapia argues his counsel was ineffective for failing to challenge venire jurors (VJ) 15, 28, 35, and 44 for cause.

VJ 15 and 28 expressed some level of inconvenience if they had to serve on the jury. VJ 15 said he would have difficulty finding childcare, but answered he was okay being on the jury. VJ 28 said he had a farm to worry about and could not guarantee he would be "here 100 percent mentally," but would try. RP (Jan. 31, 2019) at 627. VJ 35 answered he did not like gangs and explained he did not like it when they ganged up and bullied people or vandalized the community with graffiti. He said a prior employer of his got "tagged big time" and it took a morning to get it covered up. RP (Jan. 31, 2019) at

23

505. Tapia's objection to VJ 44 is that his wife is an employee of the prosecutor's office. However, the record cited by Tapia does not support his objection.

An appellant has a constitutional right to an unbiased jury trial. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion); *City of Cheney v. Grunewald*, 55 Wn. App. 807, 810, 780 P.2d 1332 (1989). The presence of a biased juror cannot be harmless and allowing a biased juror to serve on a jury requires a new trial without a showing of prejudice. *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015). If the juror demonstrates actual bias, empaneling the biased juror is a manifest error. *Id*. There are three grounds on which counsel may challenge a juror for cause: implied bias, actual bias, and for certain types of "defect[s] in the functions or organs of the body." RCW 4.44.170. "Implied bias" is present when a juror is related to or associated with either party, when a juror has previously served on a jury on the same or a related case, or when a juror has an interest in the outcome of the case. RCW 4.44.180. "Actual bias" is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging . . . ." RCW 4.44.170(2).

Challenging a juror for cause based on actual bias "must be established by proof and the proof must indicate that the challenged juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." *Brady v. Fibreboard Corp.*, 71 Wn. App. 280, 283, 857 P.2d 1094 (1993) (citation omitted). The fact that a juror formed an opinion on the matter is not enough for a challenge for cause based on actual bias. *Id.* (citing RCW 4.44.190). "[T]he question is whether a juror with preconceived ideas can set them aside." *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

In this case, both VJ 15 and VJ 28 indicated they might be inconvenienced by serving on the jury. However, the statements were not "unqualified statement[s] expressing actual bias." *Irby*, 187 Wn. App. at 188. VJ 15 said she was fine serving on the jury, and VJ 28 said he would try to focus on the evidence. A challenge of bias for potential inattentiveness almost certainly would have been rejected.

VJ 35 expressed sentiment that is common to unbiased persons. No one likes it when gangs beat up or bully people, and no one likes it when gangs vandalize property with graffiti. VJ 35's candid answers reflect a person willing to be open and honest about feelings common to potential jurors. A challenge of bias would have been rejected, especially here, where there was no gang evidence admitted.

25

We reject Tapia's argument that his trial counsel was ineffective for not moving to exclude these four venire jurors.

c.      *Failure to inquire about a juror's difficulty hearing*

Tapia next argues his counsel was ineffective for not inquiring about a juror's difficulty in hearing. He argues one might never know how many jurors had difficulty hearing the evidence and improperly relied on other jurors to tell them about the substance of the testimony.

During one of the breaks at trial, the bailiff informed the trial court that one of the jurors said it was sometimes difficult to hear the person on the witness stand. However, contrary to Tapia's assertion, the court was concerned and immediately discussed the issue with both parties. The court was a little surprised given that it had previously directed the jurors several different times to raise their hand or their paddle if they had any trouble hearing.

So, when the bailiff informed the court what a juror relayed, the court asked, "Does counsel agree with me, several times I've already told them during the trial, I've said if they didn't hear anybody to raise their hands?" to which both parties responded "yes." RP (Feb. 7, 2019) at 1215-16. The court indicated it would emphasize this again

and asked if either party wanted the court to do anything additional. Neither party requested anything more of the court.

When the jurors returned to the courtroom, the court said:

> I want to emphasize again, I want to make this clear, please don't be shy, we would appreciate, we want and expect you to let us know if you can't hear something, raise your hand. You'll be in good company, you'll be in my company and the court reporter's company, because we've had to do it when people talk too fast, for instance. But if there's a volume issue or you can't hear something, raise your hand, and I will fix it. Please.

RP (Feb. 7, 2019) at 1216.

Tapia's ineffective assistance argument is based on mere speculation without factual support. The record shows the trial judge took great pains to make sure every venire juror and selected juror could hear the proceedings.

### d. Not citing Supreme Court authorities to support his bolstering objections

At times, the trial court overruled proper defense objections to evidence that should not have been admitted until redirect. The admission of the evidence permitted the State to improperly bolster the testimony of witnesses. Tapia argues his counsel was deficient for not citing Supreme Court authorities when he objected.

For instance, in *State v. Ish*, 170 Wn.2d 189, 198-99, 241 P.3d 389 (2010) (plurality opinion), the court held that evidence a witness has promised to give truthful

27

testimony in exchange for reduced charges may amount to vouching and should be introduced on redirect only if the defense challenges the witness's credibility on cross-examination. Here, Tapia objected to the State bringing out this point during Julio's direct testimony, but the trial court overruled the objection. In doing so, the trial court erred.[9] Nevertheless, there is no requirement for defense counsel to explicitly cite a case when making a proper objection. Counsel's failure to do so, therefore, did not fall below an objective reasonable level.

Additionally, we discern no prejudice for defense counsel's failure to explicitly cite a case when making the proper objection. Defense counsel's strategy was to attack the credibility of the cohort witnesses and, during cross-examination, defense counsel did attack the credibility of these witnesses. Therefore, the same evidence complained of would have been admitted on redirect. For this reason, Tapia fails to establish his trial counsel's purported deficient performance prejudiced him.

Similarly, in *State v. Bourgeois*, 133 Wn.2d 389, 400-02, 945 P.2d 1120 (1997), the court held that evidence regarding a witness's fear of testifying is inadmissible on

---

[9] We acknowledge there is authority permitting bolstering evidence to be admitted on direct if the defense has already stated its intent to attack a witness's credibility. *See, e.g.*, *State v. Smith*, 162 Wn. App. 833, 848, 262 P.3d 72 (2011). Regardless, the Supreme Court has been clear on the proper procedure, which is to admit the evidence on redirect and only if the witness's credibility is attacked on cross-examination.

28

direct examination and should be introduced on redirect only if the defense challenges the witness's credibility on cross-examination. Here, Tapia objected to the State asking Julio on direct if he was afraid to testify, yet the trial court improperly overruled the objection. Again, the trial court erred. But for the reasons alluded to above, defense counsel's failure to cite authority in conjunction with a proper objection does not constitute ineffective assistance of counsel.

> e.      *Failure to renew motion in limine about cartel evidence*

Tapia argues his trial counsel was ineffective for not renewing his motion in limine to exclude evidence of gangs or cartels.

Contrary to Tapia's argument, the State did not improperly present gang or cartel evidence. The closing statements by the prosecutor, excerpted by Tapia, are not inadmissible evidence of gangs. Rather, the prosecutor simply summarized the evidence presented. When discussing the sign stabbed into the victim, he simply proffered that the sign referred to what happens to people who do not respect the Gulf Cartel. However, the prosecutor also noted in closing: "[G]uess what our sign says? It talks about the Gulf Cartel. Now, there's *no real evidence besides what the sign says that he's actually in a cartel.*" RP (Feb. 20, 2019) at 2141. Thus, the prosecutor summarized the evidence and

concluded that with the exception of the sign, there was no real evidence that Tapia was part of a gang or cartel.

Because Tapia has not established that his counsel's decision not to renew the motion during the State's closing was not a legitimate trial tactic, he fails to demonstrate his counsel was ineffective. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (explaining it is a legitimate trial tactic to forgo an objection to avoid highlighting certain evidence).

4.    CHANGE OF VENUE

Tapia argues the trial court erred when it denied his motion for change of venue. He argues that two articles published in local newspapers during jury selection deprived him of his due process right to a fair trial. The two articles, one appearing late after the first day of voir dire and the other appearing early the next morning, contained substantial information previously ruled inadmissible by the trial court: The first article stated that Tapia and one of his cohorts were awaiting trial for first degree murder in a second case. The second article (1) referred to Tapia as an illegal alien, (2) referred to his cohorts as illegal aliens, (3) said that the sign stabbed into Jill's back referred to the Gulf Cartel, (4) said that the Gulf Cartel is infamous for widespread kidnappings, human trafficking and murders, and (5) said that Tapia was involved in another kidnapping and murder case.

The due process clause of the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution require that an individual charged with a crime receive a fair and impartial trial. This same right is guaranteed by article I, section 22 of the Washington Constitution.

A trial court's decision to grant or deny a motion to change venue will not be overturned absent an abuse of discretion. *State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991). "A trial court abuses its discretion when its decision is 'manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017) (internal quotation marks omitted) (quoting *State v. Garcia*, 179 Wn.2d 828, 844, 318 P.3d 266 (2014)). Due process requires that a motion to change venue be granted when a probability of prejudice to the defendant is shown. *State v. Crudup*, 11 Wn. App. 583, 586, 524 P.2d 479 (1974). In determining whether a motion to change venue is proper, the court must consider nine factors, referred to as the *Crudup* factors:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of the prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of the

publicity; (8) the severity of the charge; and (9) the size of the area in which
the venire is drawn.

*Id.* at 587.

Several factors weigh strongly for a change of venue. First, Tapia faced the most serious of charges, aggravated first degree murder, punishable by a life sentence. Second, the articles appeared in local newspapers contemporaneous with jury selection, viewable by the residents of the various cities, towns, and communities in Grant County. Third, the articles were highly inflammatory and seemed to include much of the notorious information excluded by the trial court.

Although the articles were disseminated in the midst of jury selection, they were not disseminated too late for the trial court and the parties to take appropriate precautions. And, appropriate precautions were taken.

The trial court and the parties spent substantial time during the second and third days of jury selection asking venire jurors whether any had heard of the case and then privately questioning each venire juror who responded affirmatively. The process ensured that any venire juror who had read one of the articles and could not decide the case fairly was removed for cause. Only one venire juror who had read an article was not removed for cause. This venire juror had read the first article. The only prejudicial information in that article was that Tapia was awaiting a second trial for murder. When

32

questioned broadly about what she remembered, the venire juror could not recall this prejudicial information.

We are convinced the careful steps taken by the trial court were sufficient so that the jury selected by the parties was fair and unbiased. The record reflects that the parties questioned two panels of jurors and a third panel was available but unnecessary. The fact that the parties had sufficient qualified jurors from two panels and did not resort to the third is further evidence a fair jury was empaneled. We conclude the trial court did not abuse its discretion when it denied Tapia's motion for change of venue.

5.    ADMISSIBILITY OF NELOS RECORDS AND DEMONSTRATIVE MAP UNDER *FRYE*[10]

Tapia argues the trial court erred by admitting the NELOS records and the demonstrative map used to show when and where his and his cohorts' cell phones were relative to Jill's murder.

Washington uses the *Frye* standard for determining the admissibility of novel scientific evidence. *State v. Copeland*, 130 Wn.2d 244, 261, 922 P.2d 1304 (1996). The standard has two parts. It asks (1) whether the underlying theory is generally accepted in the scientific community, and (2) whether there are techniques utilizing the theory that are

---

[10] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

capable of producing reliable results. *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994). Conversely, evidence not involving "new methods of proof or new scientific principles" is not subject to examination under *Frye*. *State v. Baity*, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000).

This court reviews a trial court's *Frye* determination de novo. *Copeland*, 130 Wn.2d at 255-56.

### *NELOS data*

NELOS is AT&T's specific name for cell-site location information (CSLI). As explained below, the use of CSLI is widely used and accepted in the scientific community and in courts throughout the nation and, therefore, not subject to examination under *Frye*.

Cell phone providers generate CSLI data by using proprietary techniques to calculate a location for the phone and a confidence level of its accuracy. The United States Supreme Court has explained, "[e]ach time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI)." *Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507 (2018). "Cell phones continuously scan their environment looking for the best signal." *State v. Phillip*, 9 Wn. App. 2d 464, 475, 452 P.3d 553 (2019) (quoting *Carpenter*, 138 S. Ct. at 2211), *review denied*, 194 Wn.2d 1017 (2020). In so doing, a cell phone

periodically identifies itself to the closest cell tower—not necessarily the closest cell

tower geographically, but the one with the strongest radio signal—as it moves through its

network's coverage area.  This process is known as "pinging."  *State v. Muhammad*, 194

Wn.2d 577, 582 n.1, 451 P.3d 1060 (2019).  Because pinging nearby cell towers is

automatic and occurs whenever the phone is on without the user's input or control,

CSLI (NELOS in this case) is generated even when there is no "activity on the device."

RP (Feb. 12, 2019) at 1638.  Additionally, many applications continually run in the

background also generating CSLI even when the phone is not being used.

Recent cases demonstrate that the use of CSLI to determine the approximate

geographic area within which a cell phone is located is neither new nor novel and has

been widely accepted as reliable by numerous courts throughout the country.  In a widely

cited case, the Seventh Circuit in *United States v. Hill* stated that "[h]istorical cell-site

analysis can show with sufficient reliability that a phone was in a general area, especially

in a well-populated one.  It shows the cell sites with which the person's cell phone

connected, and the science is well understood."  818 F.3d 289, 298 (7th Cir. 2016).  The

*Hill* court explained the technique utilized for historical cell-site analysis had been

subjected to publication and "peer criticism, if not peer review."  *Id.*  However, the court

cautioned that CSLI data does not provide an exact location at a given time, and the admission of such evidence should clearly indicate this to the jury. *Id.* at 299.

Because the use of CSLI is so widespread, courts no longer focus on the accuracy of CSLI nor do courts focus on whether the specific software used by an expert to translate the CSLI data into a map or animation is trustworthy or accurate. Rather, accuracy to a certain degree is presumed. Indeed, it is precisely because CSLI is accurate and allows law enforcement to track a person's movements that courts, including the United States Supreme Court, have now held that CSLI information should not be disclosed without a search warrant.

Because CSLI is not based on new or novel science, the trial court did not err by admitting the NELOS records.

*Demonstrative map*

Courts recognize that a variety of software is available to translate the vast amount of data received by cell phone providers into a graphic display such as a location map that is helpful to the jury when hearing about the data. Regardless of the software used, the underlying theory of using cell phone provider location data to determine the general location of a cell phone is neither new nor novel and has been widely accepted in both the scientific community and in courts throughout the nation.

36

One notable case is *State v. Ramirez*, 5 Wn. App. 2d 118, 425 P.3d 534 (2018),

*review denied*, 192 Wn.2d 1026 (2019). There, the appellant argued that the software

used by the expert was not validated and his testimony should have been excluded. The

*Ramirez* court rejected the argument: "With respect to the *Frye* standard, cell site location

testimony is not novel; it is widely accepted throughout the country." *Id.* at 136. The

court explained that although the Federal Bureau of Investigation expert used a

proprietary software to map out cell tower strength, the underlying theory of the software

was not novel, was understood, well documented, and the results could be replicated.

Thus, the use of proprietary software did not cause the testimony to be outside of *Frye*.

*Id.* at 136-38. The *Ramirez* court also explained that the expert was "careful to explain

that her testimony provided information only of the approximate area of [the appellant's]

cell phone" and did not overpromise by attempting to show the location of the appellant

with a precise location. *Id*. at 137.

### Application

Here, similar to *Ramirez*, the State presented evidence of cell phone location

through its expert, Michael Fegely, who used proprietary software. Fegely testified that

AT&T creates the NELOS data in the normal course of its business. The NELOS data

contains thousands of lines of information (including an event number, connection date

and time, longitude and latitude, and an accuracy rating). The proprietary software

(TRAX) developed by Fegely's company, ZETX, uploads all the data and puts them on

overlays of Google Earth, and can also create a color-coded video if there are multiple

phone numbers. The program creates a graphic overlay by mapping each NELOS

location hit by using the provider supplied latitude, longitude, and applying the provider's

accuracy rating.

When discussing the visual aid, an animated or moving map in this case, Fegely

explained that each of the phone numbers had its own color overlay and that all overlays

were combined on one map to demonstrate their respective locations at certain times.

According to Fegely, "the . . . overlay is where [he] would expect the phone to be. It can

be outside of this. It's just we're giving you our best estimate based on the number of

towers in the area." RP (Feb. 12, 2019) at 1596.

The use of demonstrative or illustrative evidence is favored, and the trial court is

given wide discretion in determining whether to admit demonstrative evidence. *In re

Pers. Restraint of Woods*, 154 Wn.2d 400, 426, 114 P.3d 607 (2005). "[C]omputer

programs routinely generate maps that correspond to real-world data." *Ramirez*,

5 Wn. App. 2d at 137.

38

Here, the trial court allowed the animated or moving map for illustrative purposes only. It found that it would be helpful to the jury in understanding the data and Fegely's testimony. As generally accepted throughout the courts, the visual aid in this case was helpful for the jurors to understand the extensive amount of CSLI data received from a cell phone provider.

We conclude the trial court did not abuse its discretion by admitting the demonstrative map.

6. *SMITH* AFFIDAVIT

Tapia argues the trial court erred by admitting Chivo's sworn statement. He contends the four-part *Smith* test was not satisfied.

A decision to admit or exclude evidence is generally viewed for an abuse of discretion. *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012). Discretion is abused where it is exercised on untenable grounds or for untenable reasons or applies the wrong legal standard. *Dix v. ICT Group, Inc.*, 160 Wn.2d 826, 833, 161 P.3d 1016 (2007); *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Prior statements of testifying witnesses are considered hearsay unless they

fall under an exclusion or exception to the hearsay rule.  Hearsay exclusions include a

witness's prior inconsistent statement.  ER 801(d)(1).

> ER 801(d)(1) provides that an out-of-court statement is not hearsay if
>
> [t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is (i) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, *or other proceeding*, or in a deposition.

(Emphasis added.)

"'[I]nconsistency is not limited to diametrically opposed answers but may be

found in evasive answers, inability to recall, silence, or changes of position.'"  *State v.*

*Phillips*, 6 Wn. App. 2d 651, 671, 431 P.3d 1056 (2018) (quoting *United States v. Dennis*,

625 F.2d 782, 795 (8th Cir. (1980)), *review denied*, 193 Wn.2d 1007, 438 P.3d 116

(2019).  Tapia does not dispute that Chivo's trial testimony was "inconsistent" for

purposes of ER 801(d)(1).

In *State v. Smith*, our Supreme Court held that a written statement given in a police

interview can constitute an "other proceeding" under ER 801(d)(1)(i) if "'minimal

guarantees of truthfulness'" are met.  97 Wn.2d 856, 862, 651 P.2d 207 (1982) (quoting

4 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE, § 419, at 169-

71 (1980)).  The *Smith* court determined that "minimal guarantees of truthfulness" were

met because the statement was written by the witness, attested to by a notary, and made

under oath subject to penalty of perjury. *Id*. The court cautioned that "each case depends on its facts with reliability the key." *Id*. at 863.

In *State v. Otton*, 185 Wn.2d 673, 374 P.3d 1108 (2016), the Supreme Court cited the following four-part test we developed for applying *Smith*:

> "(1) Whether the witness voluntarily made the statement, (2) whether there were minimal guaranties of truthfulness, (3) whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause, and (4) whether the witness was subject to cross examination when giving the subsequent inconsistent statement."

*Id.* at 680 (quoting *State v. Binh Thach*, 126 Wn. App. 297, 308, 106 P.3d 782 (2005)).

Here, the trial court went through the *Smith* factors and found that all were met. We agree.

Deputy Delarosa reviewed the written statement with Chivo and asked if he wanted to change anything. Chivo said no, the statement was accurate. Deputy Delarosa explained to Chivo that the statement was made under penalty of perjury, explained that a false statement under penalty of perjury was a crime, and asked Chivo if he understood. Chivo said he did. Importantly, Chivo and law enforcement knew the interview was recorded. The recording of the interview ensured a clear record of voluntariness and truthfulness. We note that defense counsel had the entire interview transcribed by an independent translator, thus adding to the reliability of the statement. If the translation

41

contained errors, defense counsel could have apprised the court of any errors. At no point

did defense counsel contend that the translation contained errors.

We are satisfied that Chivo's sworn statement from his police interview

had substantial guarantees of trustworthiness, and was admissible under *Smith* and

ER 801(d)(1)(i). The trial court did not abuse its discretion when admitting that

statement.

7.      DELIBERATE CRUELTY

Tapia argues there is insufficient evidence to support the jury's finding that the

murder manifested deliberate cruelty for purposes of an aggravated sentence. This

argument is moot. The trial court sentenced Tapia to LWOP and did not redundantly

assess "additional" time based on the jury's deliberate cruelty finding.

8.      CUMULATIVE ERROR

Tapia argues cumulative error deprived him of a fair trial. The cumulative error

doctrine only applies, however, when two or more trial errors, none of which standing

alone warrants reversal, combine to deny the appellant a fair trial. *State v. Greiff*,

141 Wn.2d 910, 929, 10 P.3d 390 (2000). Unless the appellant demonstrates errors, the

cumulative error doctrine does not apply. *State v. Clark*, 187 Wn.2d 641, 655, 389 P.3d

462 (2017). Here, the trial court's two errors of admitting bolstering evidence on direct instead of redirect created no prejudice and did not deprive Tapia of a fair trial.

Affirmed, but remanded to strike "Felony Murder" from the current offenses paragraph of the judgment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____, C.J.
Pennell, C.J.

_____
Siddoway, J.