262 P.3d 72 (2011)
162 Wash.App. 833
STATE of Washington, Respondent,
v.
Tyreek Deanthony SMITH, Appellant.
State of Washington, Respondent,
v.
Darrel Kantreal Jackson, Appellant.
Nos. 39077-9-II, 39081-7-II.
Court of Appeals of Washington, Division 2.
July 26, 2011.
*73 Rebecca Wold Bouchey, Attorney at Law, Mercer Island, WA, Andrew Peter Zinner, Nielsen, Broman & Koch, PLLC, Seattle, WA, for Appellant.
Melody M. Crick, Pierce County Prosecuting Attorney, Tacoma, WA, for Respondent.

PUBLISHED IN PART OPINION
HUNT, J.
¶ 1 Darrel Kantreal Jackson and Tyreek Deanthony Smith appeal their joint jury trial convictions and weapon-enhanced sentences for two counts of aggravated first degree murder, first degree robbery, and first degree burglary. Jackson argues that the trial court violated his constitutional rights to (1) a public trial, by sealing juror questionnaires without first applying the five-factor Bone-Club[1] test; (2) due process and a fair trial, by allowing the prosecutor to vouch for a State witness's credibility on direct examination; and (3) freedom from double jeopardy, by imposing firearm and deadly weapon enhancements for first degree robbery and first degree burglary, which crimes include weapons as elements. Smith argues that the trial court violated his constitutional rights (1) to confront his accusers, by denying his motion to sever trials when his redacted codefendant's confession referenced him without satisfying CrR 4.4(c) or the Bruton[2] rule; and (2) to be free from double jeopardy, by imposing firearm and deadly weapon enhancements for first degree burglary, which included these weapons as elements of the crime. We affirm.

FACTS

I. Murders, Robbery, and Burglary
¶ 2 On September 23, 2007, police found Ruben Doria and Abraham Warren Abrazado[3] stabbed to death in their apartment. Doria's body had duct tape over his mouth and around his hands and feet.
¶ 3 Doria, who had a medical marijuana license to grow marijuana for personal medicinal use, had also engaged in the illegal sale of marijuana to friends and acquaintances. He generally required everyone to telephone before arriving at his apartment. He kept the money from his sales, large amounts of marijuana, and prescription pills in a safe, which caused his friends concern for his safety. About two to three months before his murder, Doria had begun selling marijuana to Darrel Jackson almost daily. Instead of requiring payment for each transaction, Doria "front[ed]" marijuana to Jackson, who, consequently, owed Doria money. 6 Verbatim Report of Proceedings (VRP) at 691.
¶ 4 Jackson lived with Tyreek Smith, who had previously sold cigars to Doria. Smith knew Pierre Spencer, from whom he purchased a .357 revolver some time before the murders.
¶ 5 The night before the murders, Jackson, Smith, and Spencer met to discuss robbing *74 Doria, whom, they believed, would not call the police because of his drug dealings. They planned that Jackson would call Doria under the pretext of purchasing marijuana, but in reality, they would be seeking an opportunity to gain entrance to Doria's apartment. They did not discuss murder or using masks or duct tape. Spencer offered an inactive cell phone to aid during the robbery. Jackson, Smith, and Spencer purchased a phone card to activate service on the phone, which Smith generally possessed.
¶ 6 That same night, the three men drove to Doria's apartment, Jackson phoned Doria with the newly activated cell phone, and Jackson went inside and purchased marijuana from Doria. Because several others were present inside Doria's apartment, Jackson, Smith, and Spencer abandoned the robbery plan and decided to try again the next day. The next morning, Spencer picked up Smith and drove him to an acquaintance's apartment, which Smith entered briefly; Smith returned with a rifle wrapped in a blanket.
¶ 7 Spencer and Smith picked up Jackson, and they returned to Doria's apartment to commit the planned robbery. After they saw Doria's roommate, Warren Abrazado, drive away, Jackson called Doria from the newly activated cell phone,[4] and Doria let Spencer, Smith, and Jackson inside his apartment. Jackson had the .357 revolver that Smith had previously purchased from Spencer; Smith had a four to six inch serrated knife attached on his belt and the rifle. Brandishing the revolver at Doria, Jackson instructed Spencer to bind Doria's hands, legs, and mouth with duct tape. Jackson, Smith, and Spencer then put on gloves. Smith bound Doria as instructed. Smith turned up the stereo volume, pointed the rifle at Doria, and helped Spencer gather marijuana plants. Jackson instructed Spencer to look for "a little safe" in the bedroom. 11 VRP at 1447. When Spencer could not locate Doria's safe, Jackson began looking for it. Smith pointed the revolver at Doria and hit him on the head with it, causing Doria to bleed.
¶ 8 When Jackson returned to the front room with the safe, Smith said they had to "get rid of" Doria because he could potentially identify them. 11 VRP at 1450. Someone knocked on the door, and Doria's phone began to ring. After the person at the door left, Spencer resumed carrying marijuana plants to the front room. When Spencer next returned, he saw Smith stabbing Doria. Because they "were in this all together," Smith handed the knife to Jackson, who stabbed Doria once; Jackson then handed the knife to Spencer, who also stabbed Doria once. 11 VRP at 1458. After checking Doria's pulse, Smith slit Doria's throat.
¶ 9 Jackson, Smith, and Spencer were about to load the plants into their vehicle when they heard keys unlocking Doria's apartment door. Abrazado entered, saw Doria's body, and said, "Oh, my God, please don't kill me!" 11 VRP at 1464. Jackson and Smith grabbed Abrazado and pulled him into the apartment; Jackson slit Abrazado's throat. Jackson, Smith, and Spencer loaded into Doria's vehicle the marijuana plants, a video-game console, a laptop computer, and the safe; after unloading at Jackson's apartment, Jackson then drove Doria's vehicle to a local casino, with Spencer following him in his vehicle, where Jackson and Spencer abandoned the stolen vehicle.
*75 ¶ 10 On returning to Jackson's apartment, Smith told Jackson and Spencer that he realized they had left their used latex gloves in Doria's apartment. All three men returned to Doria's apartment; Smith went inside, retrieved the gloves, and took another marijuana plant and a bag of marijuana. About four months later, police arrested Jackson and Smith on suspicion of the crimes. Jackson and Smith made incriminating statements against each other. Police also arrested and charged Spencer, who confessed and gave a statement implicating all three men.

II. Procedure
¶ 11 The State charged Jackson, Smith, and Spencer with two counts of aggravated first degree murder, one count of first degree robbery, and one count of first degree burglary, with deadly weapon enhancements on each count. The State later amended the information to add two counts of felony murder against Jackson and Smith and a firearm sentencing enhancement to all counts.

A. Spencer's Plea Agreement with the State
¶ 12 Spencer entered into a plea agreement with the State, under which he would "immediately enter guilty pleas" to the original charges but if he testified truthfully at Jackson and Smith's trial he may withdraw his guilty pleas and instead plead guilty to first degree murder and first degree manslaughter, for which, instead of life imprisonment without parole, he would receive a sentence between 240 and 320 months (20-26 years) for first degree murder with his sentence for first degree manslaughter running consecutively by law, and with the further understanding that his term of confinement may not be reduced by "good time" credit. Ex. 263. Jackson and Smith moved in limine for permission to cross-examine Spencer about collateral matters to impeach his credibility. The trial court ruled that Jackson and Smith could ask Spencer initial questions about collateral matters to show prior inconsistent statements for the purpose of attacking his credibility.

B. Joinder and Redaction of Codefendants' Statements
¶ 13 After conducting separate CrR 3.5 hearings for Jackson, Smith, and Spencer, the trial court ruled their statements admissible. Smith and Jackson moved for separate trials under CrR 4.4(c)(1) and Bruton,[5] arguing that their heavily-intertwined statements violated their confrontation rights. The trial court denied the motions to sever and asked for all parties' cooperation in redacting problematic portions of Smith's and Jackson's statements to protect them from testifying against each other and to let "a fair trial triumph." VRP (Dec. 30, 2008) at 30.
¶ 14 The parties and the trial court worked cooperatively to redact the statements. Despite maintaining that redaction would be insufficient and that only severance would cure the constitutional violation, Smith participated in these efforts to redact the statements. Based on Smith's expressed preference, the trial court redacted Spencer's name, in addition to Jackson's name; the other parties deferred to Smith's preference.

C. Juror Selection
¶ 15 The parties agreed to the use and to the content of the juror questionnaires, including the following language telling the jurors that the court clerk would seal their information:
The information obtained through this questionnaire will be used solely for the purpose of selecting a jury. The questionnaire will become part of the court's permanent record and will not be distributed to anyone except the lawyers and the judge. The original will be filed under seal and no one will be allowed access except by court order.

Jackson Clerk's Papers (JCP) at 296 (emphasis added).
¶ 16 When the State asked about sealing the juror questionnaires, the trial court explained its normal procedure: After completing jury selection, the parties return their copies of the juror questionnaires to the court's judicial assistant for shredding. The *76 court retains the original set of questionnaires and orders them sealed, giving the jurors "some expectation of privacy[.]" 1 VRP at 70. Following this explanation, the trial court specifically asked Jackson if this procedure was satisfactory; Jackson replied that it was. Jackson, Smith, and the State then signed a stipulation, agreeing to the trial court's proposal for sealing the jury questionnaires.
¶ 17 The entire jury voir dire occurred on the record in open court. When individual jurors indicated a preference to discuss specific issues privately, the trial court and counsel questioned them in open court, on the record, in the presence of all parties. The trial court neither closed the courtroom nor excluded the public at any time. After the parties completed voir dire, the trial court ordered the jury questionnaires sealed.

D. Trial

1. Opening statements
¶ 18 The State's opening statement outlined Jackson and Smith's participation in the robbery, told the jury that they had given statements to police, and explained about Spencer's participation in the crimes and his plea bargain with the State:
The third villain who was responsible will also be here in court. His name is Pierre Spencer. He will come here and tell you how Warren Abrazado and Ruben Doria died and why. He was a codefendant with the two defendants here before you. He has agreed with the State of Washington to tell you the truth about what happened in exchange for a fairly modest leniency. He has stepped up. He has pled guilty to the charges against him. You will learn that he is looking at approximately 30 years of hard time in prison. I don't mean 30 years' sentence, serve five years, and get out on [parole]. The evidence will show you that he looking at three decades in prison as punishment for his role, and that is after providing truthful testimony to you.
5 VRP at 516-17 (emphasis added). Neither Smith nor Jackson objected.
¶ 19 Smith's opening statement told the jury that Spencer's testimony would be "incredible"[6]; that Smith's counsel was "going to have a lot of questions for Mr. Spencer"[7]; and that Smith had participated in the planning and commission of the robbery, had been "present when the dummy phone was activated," but that "he was not present in the apartment when Mr. Doria and Mr. Abrazado were stabbed." 5 VRP at 558.
¶ 20 Jackson's opening statement told the jury that Jackson had clearly been involved in planning the robbery. But when Jackson's counsel inadvertently mentioned co-defendant Smith's first name, "Tyreek," as having gone with Jackson and others to Doria's apartment the night of the robbery, Smith objected and moved for a mistrial. 5 VRP at 577. Smith argued that by naming him, Jackson had rendered futile the redacted codefendants' statements and the other accommodations for their joint trial. The trial court denied Smith's motion for mistrial and, instead, accepted Jackson's offer to tell the jury that he had been mistaken. Again addressing the jury, Jackson's counsel rephrased, "[L]et me back up and tell you that I misspoke in my last statement. That Mr. Jackson, in his statement, said that he and others went to the apartment." 5 VRP at 579 (emphasis added). Smith did not ask the trial court to give the jury a cautionary instruction to disregard Jackson's reference to "Tyreek." 5 VRP at 577.

2. Spencer's testimony
¶ 21 Out of the jury's presence, the State offered two exhibitsSpencer's redacted plea agreement with the State and Spencer's statement on plea of guilty. The State explained that the parties had previously agreed to redact the section discussing polygraph tests from Spencer's plea agreement. When the trial court asked whether this section had "been redacted to everybody's satisfaction," Jackson, Smith, and the State all responded, "Yes." 10 VRP at 1349. The trial court then admitted both Spencer's redacted *77 plea agreement and his guilty plea statement without objection by Jackson or Smith.
¶ 22 After the jury returned to the courtroom, the State asked Spencer on direct examination what type of information he was bound to provide under his plea agreement with the State. Spencer replied that he was obligated to cooperate with the investigation and to give a truthful account of the events that had occurred in Doria's apartment. This portion of Spencer's testimony proceeded as follows:
[Prosecutor]: And was it, basically, your understanding that you had an ongoing duty to provide truthful information in connection with this case?
[Spencer answered in the affirmative.]
[Prosecutor]: . . . [I]f you have failed to comply with the Plea Agreement, what's your understanding as to what happens?
[Spencer]: It is life without parole.
[Prosecutor]: If you provide information that is not truthful, what is your understanding of what happens to you?
[Spencer]: That, I will get life without parole.
. . .
[Prosecutor]: If you provide truthful information, if you cooperate, if you meet with the attorneys for both sides, do everything that you are supposed to do, how much time do you understand that you are looking at at that point?
[Spencer]: 25 years, something like that.
10 VRP at 1354-55 (emphasis added). Neither Smith nor Jackson objected.
¶ 23 After reviewing the agreement terms with Spencer, the State asked:
[Prosecutor]: So what happens to you today, Mr. Spencer, if you say something that is not true?

[Spencer]: My plea agreement is void.
[Prosecutor]: What happens to you?
[Spencer]: . . . I will get life without parole.
10 VRP at 1362 (emphasis added). Again, neither Smith nor Jackson objected.
¶ 24 On cross-examination by Smith, Spencer testified that when giving his initial statement to police, he had not been aware that the State was considering offering him leniency. Smith also asked whether (1) under the terms of the plea agreement, Spencer would plead guilty to first degree murder and first degree manslaughter; and (2) Spencer expected to be sentenced to 25 years in prison. Spencer replied, "Yes," to both questions. 11 VRP at 1515. On redirect, the State asked Spencer:
Is it your understanding that you will be allowed to withdraw your plea and enter a plea to reduced charges of Murder in the First Degree and Manslaughter in the First Degree no matter what you say here today or no matter whether you tell the truth?
11 VRP at 1591. The trial court sustained Jackson's objection that this question "mischaracterize[d] the agreement." 11 VRP at 1591. The State then rephrased the question:
[Prosecutor]: [I]s it your understanding that you will get that deal regardless of whether you tell the truth?

[Spencer]: No sir.
11 VRP at 1591-92 (emphasis added). Neither Jackson nor Smith objected to the State's rephrasing of the question or to Spencer's answer.
¶ 25 On re-cross examination by Jackson, Spencer testified:
[Jackson's counsel]: Isn't it true that the person who decides whether or not you are being completely truthful is sitting right here, the prosecutor?
[Spencer]: I don't think so, sir.
[Jackson's counsel]: These 14 people, here, don't decide, do they?
11 VRP at 1599. The trial court sustained the State's objection that the statement was argumentative.

3. Motions for mistrial and to dismiss
¶ 26 After the State rested, Smith renewed his motions for mistrial and severance. Pointing to Jackson's redacted statements which substituted "someone else" for "Spencer" as the person who had first approached, hit, and stabbed DoriaSmith argued that *78 the jury would attribute the described actions to him, rather than to Spencer, and that such attribution would prejudice him (Smith). 13 VRP at 1820. The trial court denied Smith's motions, ruling that the redactions complied with Bruton and that the jury had been properly instructed.

4. Closing arguments
¶ 27 During closing argument, the State asked the jury to evaluate Spencer's demeanor on the stand, reminded them that they were the sole judges of credibility, and argued:
[Spencer] was told, from day one, you need to tell the truth. Never was he told, hey, you need to implicate Jackson; you need to implicate Smith; you need to make the State's case work. What he was told, from day one, was that you have to tell the truth. He knows because he has signed this written plea agreement that tells [him] in no uncertain terms, if you don't tell the truth, life in prison, no parole. That is a huge incentive for him to come in here and take his oath seriously and tell you the truth.
14 VRP at 1884-85. Neither Smith nor Jackson objected.
¶ 28 In Smith's closing argument, he emphasized the trial court's instruction for the jury to evaluate Spencer's testimony with "great caution." 14 VRP at 1950. In rebuttal, the State agreed, reiterating that it was appropriate for the jury to look at Spencer's testimony with caution.

E. Verdicts and Sentences
¶ 29 The jury found both Jackson and Smith guilty of all six counts; the jury also answered "yes" on the special verdicts for the aggravating sentencing factors and the deadly weapon enhancements (being armed with both a knife and a gun). JCP at 255-64, Smith Clerk's Papers (SCP) at 82-88. At sentencing, the trial court merged counts 1 and 3 and also merged counts 2 and 4, imposed sentences of life in prison without parole for the aggravated murder counts and high standard-range sentences for the first degree robbery and first degree burglary counts, and added the weapon enhancements.
¶ 30 Jackson and Smith appeal their convictions and enhanced sentences.

ANALYSIS

I. Sealing of Jury Questionnaires
¶ 31 Jackson argues that the trial court violated his right to a public trial by sealing the jury questionnaires without first conducting a courtroom-closure analysis under State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995). This argument fails. We hold that the trial court's sealing of the confidential juror questionnaires did not constitute a courtroom closure and, therefore, no Bone-Club analysis was required.
¶ 32 In response to the State's question at the beginning of voir dire, the trial court explained its normal procedures for sealing juror questionnaires: (1) Only counsel and the trial court would view the questionnaires; (2) the questionnaires would not be available to the general public; and (3) the court clerk would seal the questionnaires after voir dire. Jackson agreed to the language in the juror questionnaires that explained these procedures and expressly affirmed that he was satisfied with these procedures. Thereafter, Jackson actively participated in voir dire, using the questionnaires to his advantage by identifying and engaging with jurors who asked to be questioned individually.
¶ 33 As we recently held in In re Pers. Restraint of Stockwell, 160 Wash.App. 172, 180-81, 248 P.3d 576 (2011), the trial court's sealing of juror questionnaires after voir dire is not "structural error";[8] nor does it render the trial fundamentally unfair. As was the case in Stockwell, Jackson had full access to the questionnaires and benefitted from the trial court's promise to the prospective jurors that their questionnaires would be *79 sealed after voir dire; this assurance of confidentiality made it more likely that the jurors would candidly reveal in their questionnaires information that Jackson might use to challenge them for cause. See Stockwell, 160 Wash.App. at 180-81, 248 P.3d 576.
¶ 34 As we noted in Stockwell, sealing juror questionnaires after voir dire, at most, affects only the public's right to "open" information connected to the trial. 160 Wash. App. at 181, 248 P.3d 576. Here, however, the sealing procedure did not affect the public's right to open information because Jackson and Smith used the "content of the questionnaires" to question the jurors "in open court, where the public could observe." Stockwell, 160 Wash.App. at 183, 248 P.3d 576. Under these circumstances, there was no courtroom closure and, therefore, no need for the trial court to consider the Bone-Club factors.[9] Accordingly, we hold that the trial court did not err in sealing the jurors' questionnaires after voir dire without first conducting a Bone-Club analysis.

II. No Prosecutorial Misconduct "Vouching"
¶ 35 Jackson next argues that we should reverse his first degree premeditated murder convictions because prosecutorial misconduct deprived him of his constitutional due process right to a fair jury trial, a challenge that he attempts to raise for the first time on appeal. More specifically, he argues that (1) the prosecutor acted with ill-intention in recounting Spencer's plea agreement to testify truthfully, thereby impliedly assuring Spencer's veracity; and (2) this improper vouching was flagrant and ill-intentioned and allows him (Jackson) to raise this challenge for the first time on appeal, despite his failure to object below. We disagree.
¶ 36 Because Jackson clearly announced at the trial's outset his intent to attack Spencer's credibility based on his plea bargain with the State, the State was entitled to engage in anticipatory rehabilitation of this witness. Therefore, the State's direct examination of Spencer about his plea bargain agreement to testify truthfully cannot be said to have been "`flagrant and ill-intentioned,'" the standard that Jackson must but cannot meet where he failed to object below.[10]State v. Weber, 159 Wash.2d 252, 270, 149 P.3d 646 (2006) (quoting State v. Stenson, 132 Wash.2d 668, 719, 940 P.2d 1239 (1997)).
¶ 37 At the outset, we acknowledge our Supreme Court's recent decision in State v. Ish, 170 Wash.2d 189, 241 P.3d 389 (2010), addressing the admissibility of witness plea-agreement truthfulness provisions[11] similar to the one at issue here: Four justices characterized eliciting testimony about this plea-agreement provision as proper method to "pull the sting" on direct examination from anticipated cross-examination of the witness. Ish, 170 Wash.2d at 206, 241 P.3d 389 (Madsen, C.J., concurring). Four other justices characterized this testimony as a "mild form of vouching" not warranting reversal. Ish, 170 Wash.2d at 197, 241 P.3d 389 (emphasis added) (citing United States v. Brooks, 508 F.3d 1205, 1210 (9th Cir.2007)). One dissenting justice characterized this testimony as reversible-error vouching. Ish, 170 Wash.2d at 206, 241 P.3d 389. Ultimately, although five justices characterized as "vouching" the State's eliciting a witness's testimony about his plea-agreement promise to testify truthfully, eight justices agreed and held that, under the facts of Ish, this conduct was not reversible error. Ish, 170 Wash.2d at 200, 201, 241 P.3d 389. Applying Ish to the analogous facts here, we, too, hold that the trial court did not commit reversible error in allowing the State on direct examination to *80 elicit Spencer's testimony about his plea-agreement promise to testify truthfully.
¶ 38 A prosecutor has reasonable latitude to draw inferences from the evidence, including inferences about witness credibility. State v. Gregory, 158 Wash.2d 759, 810, 147 P.3d 1201 (2006). Nevertheless, it is improper for the State to vouch for the credibility of a government witness; vouching may occur when the prosecution places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony. United States v. Roberts, 618 F.2d 530, 533 (9th Cir.1980), cert. denied, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981). Four justices, plus the dissenting justice in Ish, stated that the type of questioning in which the State engaged constituted "vouching" with the four characterizing it as only "mild" vouching. Ish, 170 Wash.2d at 197, 241 P.3d 389. Regardless of whether characterized as "vouching" or not, however, a majority of eight justices agreed that this questioning was not improper under the facts of Ish and was not reversible error. Ish, 170 Wash.2d at 191, 206, 241 P.3d 389.
¶ 39 Both the lead and concurring opinions in Ish, again, eight justices, also noted that, under the circumstances in that case, it was not reversible error for the State to have anticipated a credibility attack on its witness and to rehabilitate its witness in advance of this inevitable attack: Where "there is little doubt" that the defendant will attack the veracity of a State's witness during cross-examination, for example, the State is entitled to engage in preemptive questioning of its witness on direct to "take the sting" out of the inevitable damaging cross-examination. Ish, 170 Wash.2d at 199 n. 10, 241 P.3d 389. Such is the case here. During pre-trial motions in limine seeking permission to address Spencer about collateral matters, both Jackson and Smith indicated their intent to impeach Spencer's credibility.
¶ 40 As expected, Smith immediately attacked Spencer's credibility in his opening statement:
When somebody says something is incredible, it can be either astonishing and shocking or it can be not believable.
You are going to hear testimony at this trial from a witness that is going to be incredible. When I use that word, I meanI'm using it with both of its meanings. Both of its connotations. That witness is Pierre Spencer. Pierre Spencer is going to give you incredible testimony. In order to understand why his testimony is incredible, we need to back up and start at the beginning of the story.
5 VRP at 556.
Mr. Spencer had an advantage. He knew what the police knew. . . . His attorney has access to . . . police reports, autopsy reports, witness statements, Mr. Smith's statement, Mr. Jackson's statement.
. . .
The prosecutor's office was interested in hearing his side of the story. The prosecutor's office believed that they had the three right people, Mr. Spencer, Mr. Smith, and Mr. Jackson. They wanted confirmation. They were willing to make a bargain in exchange for that information.
Mr. Spencer . . . told an incredible story.
. . .
Mr. Spencer entered into a deal . . . where he pled guilty to two offenses. I believe the first was for the murder. If he comes in and testifies and if he tells you all the same story that he told the police . . . he will be allowed to withdraw his guilty plea, and he will get one count of First Degree Murder and one count of First Degree Manslaughter. He will be sentenced to approximately 30 years in prison. He is a young man, mid-20's. His option was life without [parole] or to get out in his 50's.
5 VRP at 568-71. Jackson and Smith left no doubt they would attack Spencer's credibility based on his plea agreement once Spencer took the witness stand.
¶ 41 Given these background facts, the State correctly anticipated a defense attack on Spencer's credibility as a witness, based on his plea agreement. Jackson failed to object below to Spencer's testimony about his plea bargain agreement to testify truthfully. Jackson now fails on appeal to show that the State's elicitation of this testimony on direct *81 examination was "flagrant and ill-intentioned." Br. of Appellant Jackson at 34. Accordingly, we hold that Jackson cannot raise this issue for the first time on appeal as grounds for reversing his conviction, and we do not further consider it.
¶ 42 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: WORSWICK, A.C.J., and VAN DEREN, J.
HUNT, J. (concurring).
¶ 43 To the extent that my having signed the majority opinion in Stockwell[1] implies that I intended to hold that sealing juror questionnaires constitutes a partial courtroom closure, I now correct that impression. I agree with Judge Van Deren's concurring opinion statement in Stockwell: "I would hold that under the particular facts of this case, there does not appear to be any closure during voir dire triggering the requisite Bone-Club/Waller analysis." Stockwell, 160 Wash.App. at 183, 248 P.3d 576.
I concur: HUNT, J.
NOTES
[1] State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995).
[2] Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
[3] Much of the record refers to Mr. Abrazado's middle name "Warren," the name he commonly used.
[4] Phone records showed that this call was made at 1:46 pm, and that the newly activated cell phone also called Doria's phone at 1:44 pm, and 1:51 pm.

Phone records showed the following additional earlier calls on the day of the robbery and murders: (1) two phone calls between the newly activated cell phone and Smith's ex-girlfriend (Natausha Sabin-Lee) shortly after 11:00 am; (2) a call between the newly activated cell phone and Smith's relatives in Georgia at 11:23 am; (3) a call from Smith's relatives to the newly activated cell phone at 12:17 pm; (4) a call from the newly activated cell phone to Spencer's cell phone at 1:14 pm; and (5) a call from the newly activated cell phone to Smith's ex-girlfriend's work place at 1:16 pm.
Phone records for calls made during the time of the robbery and murders showed that the newly activated cell phone called Spencer's cell phone at 3:04 and 3:14 pm; Spencer's cell phone called the newly activated cell phone at 3:22 pm; for the fourth time that day, the recently activated cell phone called Doria's number at 4:21 pm; four minutes later, at 4:25 PM, the recently activated cell phone called Smith's relatives in Georgia; and the same newly activated cell phone made another call to Smith's ex-girlfriend, Sabin-Lee, at 5:33 pm.
[5] Bruton, 391 U.S. 123, 88 S.Ct. 1620.
[6] 5 VRP at 555.
[7] 5 VRP at 573.
[8] An error is "structural" when it renders a criminal trial "`fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" Stockwell, 160 Wash.App. at 180-81, 248 P.3d 576 (quoting State v. Momah, 167 Wash.2d 140, 149, 217 P.3d 321 (2009) (quoting Washington v. Recuenco, 548 U.S. 212, 218-19, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006)), cert. denied, ___ U.S. ___, 131 S.Ct. 160, 178 L.Ed.2d 40 (2010)).
[9] We decline to follow State v. Coleman, 151 Wash.App. 614, 214 P.3d 158 (2009), in which Division One of our court held that the trial court was required to conduct a Bone-Club analysis before sealing juror questionnaires that contained information about the jurors' sexual history. See also State v. Tarhan, 159 Wash.App. 819, 246 P.3d 580 (2011). We find more persuasive Judge Van Deren's concurring opinion in Stockwell, 160 Wash.App. at 182, 248 P.3d 576.
[10] In so holding here, it is not our intention to condone or to invite improper vouching.
[11] After similarly redacting a provision requiring a State's witness to take a polygraph, the trial court admitted the plea agreement over Ish's objection and allowed the State to examine the witness about his promise to testify truthfully. Ish, 170 Wash.2d at 194, 241 P.3d 389.
[1] In re Pers. Restraint of Stockwell, 160 Wash.App. 172, 248 P.3d 576 (2011).