**FILED**
**FEBRUARY 29, 2024**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37522-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | **ORDER DENYING** |
| v. | ) | **MOTIONS FOR** |
| | ) | **RECONSIDERATION** |
| GUSTAVO TAPIA RODRIGUEZ, | ) | **AND WITHDRAWING** |
| | ) | **OPINION FILED** |
| Appellant. | ) | **FEBRUARY 8, 2022** |

The court has considered the parties' motions for reconsideration of this court's opinion dated February 8, 2022, and is of the opinion the motions should be denied for the reasons discussed in the opinion filed this day. Therefore,

IT IS ORDERED that the motions for reconsideration are denied.

IT IS FURTHER ORDERED that the court's opinion filed on February 8, 2022, is hereby withdrawn and a new opinion will be filed this day.

PANEL:      Judges Lawrence-Berrey, Staab, Siddoway

FOR THE COURT:

_____
GEORGE FEARING
CHIEF JUDGE

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| STATE OF WASHINGTON, | ) | No. 37522-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| GUSTAVO TAPIA RODRIGUEZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Gustavo Tapia Rodriguez appeals after a jury

found him guilty of the aggravated first degree murder of Arturo Sosa and the first degree

kidnapping and the first degree assault of Jose Cano Barrientos. We affirm Tapia

Rodriguez's convictions, but remand for the trial court to apply the correct same criminal

conduct test to the kidnapping and assault convictions, to strike the victim penalty

assessment, to reconsider restitution interest, and to correct a scrivener's error.

FACTS

Eustolia Campuzano had been in a relationship with Arturo Sosa for almost three

years before breaking up with him in November 2016. Campuzano moved out of the

home they shared together and into Paula Rodriguez's home.

Ms. Rodriguez informed Campuzano that she knew some people who could scare Sosa. Ms. Rodriguez took Campuzano to see these people: Fernando Marcos Gutierrez and Gustavo Tapia Rodriguez. Campuzano told these men about Sosa and how she wanted to scare him.

Gutierrez and others developed a plan. Gutierrez told Julio Albarran Varona that he, Albarran Varona, Tapia Rodriguez, and Ambrosio Villanueva were going to beat up Sosa for hitting Campuzano and causing two screws to be placed into her jaw. On the evening of December 8, 2016, these four men and Salvador Gomez armed themselves with guns and went to Ms. Rodriguez's home. Gutierrez had a .40 caliber handgun. Tapia Rodriguez had a .45 caliber handgun.

Tapia Rodriguez told Campuzano they were going to scare Sosa. Most of them drank alcohol and consumed crystal methamphetamine throughout the night.

In the early morning hours of December 9, 2016, Tapia Rodriguez, Gutierrez, Villanueva, Albarran Varona, and Campuzano got into Tapia Rodriguez's GMC Yukon and drove to Sosa's house. They parked on the side of the road near the house until Sosa and a second person, Jose Cano Barrientos, left the house in the Cano Barrientos's Ford Explorer. Tapia Rodriguez and his crew followed in the Yukon.

After they reached the highway, Tapia Rodriguez began flashing his lights on and off until Cano Barrientos pulled over to see if something was wrong. Tapia Rodriguez parked his Yukon behind Cano Barrientos's Explorer.

Three or four men exited the Yukon, all armed with firearms equipped with silencers. Tapia Rodriguez and Gutierrez approached Cano Barrientos's vehicle with guns drawn; Tapia Rodriguez went to the driver's side and Gutierrez went to the front passenger side. They ordered Cano Barrientos and Sosa out of the Explorer at gunpoint. Deoxyribonucleic acid (DNA) taken from the outside front passenger door handle of Cano Barrientos's vehicle matched Gutierrez's DNA.

Tapia Rodriguez and Gutierrez ordered Cano Barrientos and Sosa to kneel between the two vehicles. They told Cano Barrientos and Sosa, "*Te voy matar*," which means, "I'm going to kill you." Rep. of Proc. (RP)[1] at 1198. They cocked their guns and pointed them at the heads of Cano Barrientos and Sosa.

By this time, the plan to beat up Sosa had changed to killing both men. Tapia Rodriguez later remarked to Albarran Varona, "[S]ometimes when things don't work out the right way, people have to die." RP at 926.

---

[1] "RP" references are to the verbatim report of proceedings of the trial unless otherwise indicated.

Realizing that both men were about to be killed, Albarran Varona warned Tapia Rodriguez that there was traffic on the highway. The armed men then loaded Cano Barrientos and Sosa into the back seat of Cano Barrientos's Explorer.

Cano Barrientos sat in the back driver's-side seat, Sosa sat in the back center seat, and Tapia Rodriguez sat in the back passenger-side seat next to Sosa, pointing a gun at him and Cano Barrientos. Albarran Varona was in the driver's seat, holding a pistol with a chambered round. Gutierrez, Villanueva, and Campuzano were in Tapia Rodriguez's Yukon, the lead vehicle, while Albarran Varona followed in Cano Barrientos's Explorer.

About one mile down the road, Sosa and Cano Barrientos tried to wrestle the gun from Tapia Rodriguez. While driving, Albarran Varona pointed his pistol at Sosa. Cano Barrientos then began choking Albarran Varona so he would not shoot Sosa. Albarran Varona fired his gun and the bullet hit Cano Barrientos in his upper chest, near his collarbone, causing him to collapse between the two front seats. Once Albarran Varona regained control of the car, he looked back, and saw Tapia Rodriguez put his gun to Sosa's head and shoot three times.

With Gutierrez's help, the men got their guns, some shell casings, and a magazine and left in Tapia Rodriguez's Yukon. Before leaving, Gutierrez made Campuzano look at Sosa's body and threatened to kill her if she said anything.

Cano Barrientos survived. Sosa died.

4

*Charges*

The State charged Tapia Rodriguez and Gutierrez with first degree murder (by all alternative means), second degree murder (with intentional murder and felony murder alternatives), first degree assault, and first degree kidnapping. In addition, the State alleged multiple aggravators and enhancements, and provided notice to Tapia Rodriguez that it would seek an aggravated murder sentence.

Albarran Varona was not charged but agreed to testify against Tapia Rodriguez and Gutierrez in exchange for a plea deal in a different murder case.

*Jury Voir Dire*

During voir dire, venire juror 16 expressed his opinion, that, as an immigrant from Russia, he experienced prejudice and hostility from others. He admitted he had racist thoughts when he was younger but his feelings changed because he kept an open mind and became more educated and aware. When jurors were asked whether anyone was going to hold Tapia Rodriguez's Mexican name or heritage against him, no one, including juror 16, answered affirmatively. However, when asked if everyone felt comfortable not delving into immigration issues because they lacked relevance to the case, juror 16 said, "Given that I came to this country legally, I think it will bother me." RP at 507. "It would influence my decision, I would think." *Id.* Following up on juror 16's comments, defense counsel clarified that Tapia Rodriguez's immigration status is

5

irrelevant to both the facts and the charges the State would be trying to prove. Juror 16 responded, "Sure, I think that thought would still linger in the back of my mind." *Id*. at 508. Defense counsel then asked, "Would you hold that against him?" And juror 16 answered, "Yes." *Id*. Juror 16 then said it might be problematic for him to ignore the immigration issue even if the judge instructed him to ignore it. He explained why it would be difficult for him to set aside his opinion on illegal immigration:

> JUROR [16]: Sure. Because this large part, myself and my family came here legally, and it was very hard to do so. We followed the proper channels to get to this country legally. And so when you see somebody do it illegally, it doesn't matter what skin color they are, they're coming from Canada, it doesn't matter. If they're doing something illegally, they're breaking the law, they're breaking the law in this country.

*Id.* at 508-09. He acknowledged that there are justifications—such as genocide or gang infestation—for fleeing a dangerous country and such justifications would possibly change his mind. Yet, even knowing there is a possibility that the defendant might have fled a dangerous country, juror 16 would hold it against Tapia Rodriguez. Finally, when defense counsel asked, "[I]s there anything we could convince you or say to you, even with the judge's instruction, say, you shouldn't hold that, that shouldn't be a factor," juror 16 said, "I'm ready to listen." *Id.* at 510. He admitted he had already judged Tapia Rodriguez "[t]o some degree," but repeated, "Like I said, I'm willing to listen." *Id.*

6

Counsel for the State and the codefendants challenged several jurors for cause, but none challenged juror 16 for cause. Counsel also exercised their peremptory challenges, but none exercised a peremptory challenge to remove juror 16. Each attorney confirmed that the jury ultimately empaneled, which included juror 16, was the jury he selected.

*Pretrial Motions in Limine*

In pretrial proceedings, Tapia Rodriguez moved to prohibit Albarran Varona's former defense attorney, Smitty Hagopian, from testifying. The State intended, through Hagopian, to show that Albarran Varona's testimony was credible because the story he told during his free talk was consistent with the State's investigation, even though the State had not made its investigatory records available to Hagopian or Albarran Varona. The court identified Albarran Varona's credibility as the central issue and found the expected testimony was factual and not improper bolstering or vouching. Based on its findings, the court denied the defense's motion in limine.

During trial, defense counsel elicited testimony from Albarran Varona that Hagopian had prepared him for a free talk with law enforcement and went through the facts of this case.

Hagopian testified he had previously represented Albarran Varona in a murder case and worked out a plea agreement with the State. Part of the agreement required Albarran Varona to tell the State everything he knew about any crimes of which he was

aware. Hagopian had no discovery from the State related to the present case, so he had no evidence to share with his client before the free talk with law enforcement. Hagopian sat in on the free talk and heard Albarran Varona reiterate what he had previously heard from his client. As explained in the State's closing argument, the information provided by Albarran Varona in the free talk was consistent with its evidence.

*State's Closing Argument*

During closing arguments, the State argued that the jury could evaluate Albarran Varona's credibility by comparing it to other evidence:

> Let's talk about what incentives he had, whether we can evaluate whether he's telling the truth. Look at the other evidence. Does his testimony match the evidence? He told us where Zapato went up to the car. Oh, guess what, his DNA is there. He told us where Tapia—actually I made a mistake, you recall in the jury instructions, listen to what the evidence is, not what we said. I made a mistake in opening when I said Tapia's fingerprint was on the driver's side, when it was on the passenger side. But it's right where it would be if he was getting into the back seat of the car, like everybody testified to, and quote, reaching up to close that door. It was his right middle finger, right where it would be.
>
> You know, if [Albarran Varona] really wanted to, could he have made up a better lie for us? Absolutely. You know what's better for our case? [Had Gutierrez been] the driver. That would have been so easy for him to make up. He could have just said [the defendants] told me what happened in the car and told us the exact same story. He didn't. It would have been better for him, it would have been better for us. He didn't.
>
> He said, I was the driver in the car, I shot [Cano Barrientos]. Why would he say that if it wasn't true?
>
> We also held back details. We held back about the fight in the car. We held back about biting and choking. That was on purpose. To test his credibility, to test whether he was going to tell us the truth.

RP at 2703-04. During rebuttal, the State argued that Albarran Varona was afraid that he

would be killed if he testified for the State:

> You know, and we put [Albarran Varona]—we put a lot of people, the state does, we put them between a rock and a hard place. We say, cooperate with us or get this, or don't cooperate with us and you get another—and you get a longer sentence. So he has a hard choice to make. He can cooperate with us and get 18 years, but he takes a risk when he does that, he's going to get a shiv in the back. And that's what he's really scared of.
>
> The difference between 18 years and life doesn't mean a whole hell of a lot if you're dead, if you've been stabbed in the back in prison. That's a decision he's got to make. And that's not an easy decision at all. It takes a long time to sort that out. It's probably a harder decision that any of us will have to make in our lives. He put himself there. You shouldn't feel sympathy for him. But it's a tough decision.

RP at 2844-45.

### *Jury Verdict*

The jury found Tapia Rodriguez and Gutierrez guilty on all counts. With respect

to Tapia Rodriguez's first degree murder verdict, the jury also found all aggravating

factors present, it found unanimously that he acted with premeditated intent, that he

caused Sosa's death in the course or furtherance of first degree kidnapping, and that he

engaged in conduct manifesting extreme indifference to human life, resulting in Sosa's

death. Further, it returned special verdict findings that Tapia Rodriguez was armed with

a firearm when he committed murder, assault, and kidnapping and that he committed

murder in the course of, in furtherance of, or in immediate flight from first degree

9

kidnapping. All aggravating factors and special verdict findings were found unanimously with regard to Gutierrez as well.

Answering special verdict form 5, the jury found Tapia Rodriguez abducted Cano Barrientos with intent to facilitate a second degree assault, inflict bodily injury, and inflict extreme mental distress. The jury found the same for Gutierrez. Answering special verdict form 11, it found Tapia Rodriguez committed kidnapping with intent to facilitate second degree assault, inflict bodily injury, and inflict extreme mental distress on the person. It found the same with respect to Gutierrez.

*Sentencing*

Tapia Rodriguez argued that his crimes of first degree assault and first degree kidnapping against Cano Barrientos should be considered the same criminal conduct for purposes of calculating his offender score and running the convictions concurrently. The trial court, however, applied the statutory intent analysis in *State v. Chenoweth*[2] to conclude that the crimes were not the same criminal conduct, consistent with the most recently published Court of Appeals opinion in *State v. Johnson*.[3] Concluding that "the most recent published caselaw appears to apply this statutory element analysis versus the objective factual analysis that was done previously," the trial court found that the assault

---

[2] *State v. Chenoweth*, 185 Wn.2d 218, 370 P.3d 6 (2016).
[3] *State v. Johnson*, 12 Wn. App. 2d 201, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740, 487 P.3d 893 (2021).

and kidnapping offenses did not "match statutorily." RP (Apr. 20, 2020) at 245-46. The

trial court reasoned:

> So, the—the element that is different here is the intent to inflict great bodily
> harm, which is an element that is separate and apart from the other charge.
> And when you do that objective statutory element review then, because
> there is a difference, it does not appear that they can be considered the same
> conduct, same criminal conduct.
>     So, at this point I am going to make a decision in favor of the State
> on this issue and we'll count those separately.

*Id.* at 246.

The trial court sentenced Tapia Rodriguez to life without the possibility of parole

on the aggravated first degree murder conviction, 183 months on the first degree assault

conviction, 128 months on the first degree kidnapping conviction, and 15 years for the

firearm enhancements, all to run consecutively. The trial court dismissed the second

degree murder conviction.

## ANALYSIS

A.     SUFFICIENT EVIDENCE SUPPORTS THE AGGRAVATED MURDER CONVICTION

Tapia Rodriguez contends the State failed to produce sufficient evidence of

premeditation to support his aggravated first degree murder conviction. Only a

premediated murder can qualify for an aggravated sentence. *State v. Irizarry*, 111 Wn.2d

591, 593-94, 793 P.2d 432 (1988).

When a defendant challenges the sufficiency of the evidence, the proper inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* This court's role is not to reweigh the evidence and substitute its judgment for that of the jury. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion). Instead, because the jurors observed testimony firsthand, this court defers to the jury's decision regarding the persuasiveness and the appropriate weight to be given the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Here, the court instructed the jury on the definition of "premeditated:"

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated.
> Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

Clerk's Papers (CP) at 418.

At trial, Albarron Varona testified that the initial plan was to beat up Sosa. He also testified that the plan changed by the time Tapia Rodriguez and Gutierrez brought

12

Sosa and Cano Barrientos out of the Explorer and made them kneel on the ground. When asked if he knew why the plan had changed, he testified he did not know then, but Tapia Rodriguez later told him, "[S]ometimes when things don't work out the right way, people have to die." RP at 926.

The State maintains that Tapia Rodriguez formed the premeditated intent to kill the two men at or before the time he had them kneel between the parked vehicles, but declined to do it there because of traffic. The facts and reasonable inferences construed in the State's favor support this. The men were then forced at gunpoint inside the back of Cano Barrientos's Explorer. One mile down the road, Tapia Rodriguez shot and killed Sosa when Sosa tried to disarm him.

The State argues that simply because the premeditated killing occurred differently than planned does not negate the fact it was premeditated. We agree. There is no requirement that the plan for premeditated killing unfold seamlessly. Most do not. Many, such as the one here, involve a struggle.

We conclude that there is sufficient evidence that Tapia Rodriguez killed Sosa with premeditated intent.

Tapia Rodriguez alternatively argues, if sufficient evidence of premeditated intent exists, then the Grant County Prosecutor's Office abused its discretion in filing the aggravated murder charge because the charged crime was not sufficiently outrageous.

13

The State makes a threshold argument that this court should decline to review this issue because Tapia Rodriguez did not raise this claim of error in the trial court. Substantively, it argues Tapia Rodriguez identifies no authority by which a court could overrule a prosecutor's charging decision when there is probable cause for the offense and to do so would violate separation of powers. We can resolve his claim of error on the threshold basis that it was not preserved.

Subject to exceptions not argued here, an appellate court may refuse to review any claim of error not raised in the trial court. *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009). Had the claim of error been raised below, the State could have argued the charging decision was within its discretion; if the court was unpersuaded, the State could have made a sufficient record to justify its discretionary decision to bring the aggravated murder charge and to the extent the trial court might have been required to enter factual findings, those findings could have been made. For these reasons, we decline to review this claim of error.

B.    TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO CHALLENGE OR REMOVE VENIRE JUROR 16

Tapia Rodriguez next argues that defense counsel was ineffective for failing to challenge or remove venire juror 16, who admitted he was biased against a person not legally in the United States.

14

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness, and counsel's deficient representation prejudiced the defendant. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant fails to establish one prong of this test, the court need not consider the other prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

To establish ineffective assistance of counsel based on trial counsel's performance during voir dire, a defendant generally must demonstrate the absence of a legitimate strategic or tactical reason for counsel's performance. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 709, 101 P.3d 1 (2004). The failure of trial counsel to challenge a juror is not deficient performance if there is a legitimate tactical or strategic decision not to do so. *State v. Alires*, 92 Wn. App. 931, 939, 966 P.2d 935 (1998). We strongly presume defense counsel's performance was reasonable. *State v. Grier*, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011).

The State maintains that defense counsel decided to not challenge juror 16 for cause or remove him with a peremptory challenge because counsel sought to persuade the jury that a State's witness—the surviving victim—was not legally in the United States and that Tapia Rodriguez was born in Texas and thus was a United States citizen.

During motions in limine, Mr. Gutierrez's trial counsel indicated he would be asking about the surviving victim's immigration status and U Visa request. During cross-examination, defense counsel in fact asked Cano Barrientos if he was an illegal immigrant and asked about his U Visa request. All of the State's civilian witnesses were Spanish speaking.

Late in the trial, the State sought to admit Tapia Rodriguez's fingerprint card. Tapia Rodriguez sought to redact an alias listed on the card, and the State sought to redact the listed place of birth, Texas. It was only after the State presented evidence that Tapia Rodriguez was not born in Texas that the court excluded the place of birth listed on the card.

The record supports the State's position that defense counsel's decision not to challenge or remove venire juror 16 was a reasonable strategic decision; that is, defense counsel thought he could establish to juror 16's satisfaction that Tapia Rodriguez was born in Texas and thus a United States citizen, while establishing that the surviving victim was in the United States illegally. We conclude that defense counsel was not ineffective.[4]

---

[4] In his motion for reconsideration, Tapia Rodriguez relies on *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022). There, the Supreme Court reversed a defendant's convictions because the prosecutor's voir dire flagrantly or apparently intentionally appealed to racial bias in a way that undermined the defendant's credibility and

Relatedly, Tapia Rodriguez argues the trial court should have sua sponte removed venire juror 16.  He quotes one aspect of *State v. Lawler*, 194 Wn. App. 275, 374 P.3d 278 (2016).  We quote both aspects:

> Both RCW 2.36.110 and CrR 6.4(c)(1) create a mandatory duty to dismiss an unfit juror even in the absence of a challenge. . . .
> . . . .
> On the other hand, a trial court should exercise caution before injecting itself into the jury selection process . . .
>
> lest it interfere with a defendant's right to control his defense.
>
> . . . Whether to keep a prospective juror on the jury panel or whether to dismiss a juror often is based on . . . trial counsel's experience, intuition, strategy, and discretion.  Trial counsel may have legitimate, tactical reasons not to challenge a juror who may have given responses that suggest some bias.  A trial court that sua sponte excuses a juror runs the risk of disrupting trial counsel's jury selection strategy.

*Id.* at 284-85 (citation omitted).  At trial, as is true in all aggravated first degree murder trials, both defendants were represented by highly experienced defense counsel.  We conclude that the trial court acted prudently by not injecting itself into the jury selection process.

---

presumption of innocence.  *Id.* at 708, 722.  Tapia Rodriguez relies on an excerpt from *Zamora* that affirms the call on courts to enforce the Constitution's guarantee against state-sponsored race discrimination in the jury system and to protect a defendant from race or ethnic prejudice.  He maintains this excerpt is inconsistent with our decision.  We disagree.  Unlike *Zamora*, Tapia Rodriguez does not raise a claim of prosecutorial misconduct.  He claims his trial counsel was ineffective for not removing juror 16.  State-sponsored race discrimination is not at issue.

C.    SENTENCING ISSUES

Tapia Rodriguez next argues the trial court abused its discretion at sentencing by concluding that his convictions for first degree kidnapping and first degree assault of Cano Barrientos were not the same criminal conduct. He also contends the trial court erroneously failed to apply the merger doctrine to the various alternative means of first degree murder found by the jury.

Same Criminal Conduct: Whenever a person is convicted of two or more serious violent offenses[5] arising out of separate and distinct criminal conduct, the sentences must be served consecutively to each other. RCW 9.94A.589(1)(b). Conversely, it stands to reason, whenever a person is convicted of two or more serious violent offenses arising out of the same criminal conduct, the sentences must be served concurrently.

"Same criminal conduct" means "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). Often, the "same criminal conduct" analysis turns on the first component, "same criminal intent."

In *State v. Westwood*, 2 Wn.3d 157, 534 P.3d 1162 (2023), the court clarified the analysis of the same criminal intent component. To properly analyze this component, a

---

[5] First degree assault and first degree kidnapping are serious violent offenses. *See* RCW 9.94A.030(46)(a)(v), (vi).

court first looks at the statutory definitions of the crimes to determine objective intent. *Id.* at 167. If the objective intent for the crimes are "the same or similar," courts then look at "whether the crimes furthered each other and were part of the same scheme or plan." *Id.* at 168. "If the actions occurred in close proximity, and the nature of the crime did not change significantly throughout, the offenses may be considered the same criminal conduct for sentencing purposes." *Id.*

The close question is whether to affirm the trial court outright, or to remand for it to apply the clarified *Westwood* test. Because the clarified test applies a "same or similar" objective statutory intent standard, and this standard is different than that applied by the trial court, we believe remand for resentencing is appropriate.

Merger: Tapia Rodriguez argues that the merger doctrine prohibited him from being sentenced for aggravated first degree murder because the aggravating element—first degree kidnapping—was also an element of the alternative means of first degree murder, i.e., felony murder. He argues, "The first degree felony murder, as an alternative, merged with the finding of premeditated first degree murder." Br. of Appellant at 44. We disagree.

> The Fifth Amendment [to the United States Constitution] protection from double jeopardy protects against multiple convictions for the same offense and *multiple punishments* for the *same offense*. *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980). "The double jeopardy clause does not prohibit the imposition of *separate punishments*

19

for *different offenses*." *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190
(1991) (emphasis added).

*State v. Arndt*, 194 Wn.2d 784, 817, 453 P.3d 696 (2019).

Tapia Rodriguez's briefing focuses on his aggravated first degree murder

conviction and the alternative means charged and special allegations alleged to elevate

first degree murder to aggravated first degree murder, primarily the kidnapping special

allegation. Tapia Rodriguez, however, fails to identify multiple punishments imposed for

the aggravated first degree murder conviction. He was sentenced to life without parole

under count 1 and was not *separately* charged with, convicted of, or punished for

kidnapping Sosa or for any of the alternative means of committing first degree murder.

"'Under the merger doctrine, when the degree of one offense [(e.g., first degree murder)]

is raised by conduct separately criminalized by the legislature [(e.g., first degree

kidnapping)], we presume the legislature intended to punish both offenses through a

greater sentence for the greater crime.'" *Id.* at 819 (quoting *State v. Freeman*,

153 Wn.2d 765, 772-73, 108 P.3d 753 (2005)). That is what occurred here. There is no

merger doctrine or double jeopardy error.

Parties' Agreements:

The parties agree the judgment and sentence should be remanded to correct

paragraph 4.1(a) by removing and replacing an erroneous reference to count 2, which was

20

dismissed, with a proper reference to count 4. They also agree that recent legislative amendments require the trial court to vacate the victim penalty assessment, and that the trial court may reconsider restitution interest. *See* RCW 7.68.030; RCW 10.82.090(2).

> D. PROSECUTORIAL MISCONDUCT CLAIM

With very little analysis, Tapia Rodriguez contends the prosecutor engaged in misconduct by making statements during closing argument that (1) argued facts not in evidence in violation of an order in limine, (2) vouched for a State's witness, and (3) misled the jury about the facts and special verdict forms.

To establish prosecutorial misconduct, Tapia Rodriguez must demonstrate that the prosecutor's conduct was improper and prejudiced his right to a fair trial. *State v. Jackson*, 150 Wn. App. 877, 882, 209 P.3d 553 (2009). Prejudice is established only where a substantial likelihood exists that the misconduct affected the jury's verdict. *Id.* at 883. Where defense counsel fails to object to the prosecutor's statement, reversal is required only where the misconduct is so flagrant and ill intentioned that no instruction could have cured the resulting prejudice. *Id.* The court reviews a prosecutor's allegedly improper statements made during closing argument in the context of the entire argument, the issues in the case, the evidence addressed, and the jury instructions. *Id.*

An appellant must provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the

record." RAP 10.3(a)(6). Here, Tapia Rodriguez cites legal authority and relevant parts of the record but makes only conclusory statements that the prosecutor committed misconduct based on the law and the record cited. He offers no argument on how the prosecutor's allegedly improper conduct prejudiced his right to a fair trial. Issues presented without meaningful analysis need not be considered. *State v. Rafay*, 168 Wn. App. 734, 843, 285 P.3d 83 (2012); *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011). Nevertheless, because Tapia Rodriguez received a sentence of life without the possibility of parole, we use our discretion to consider the inadequately argued issues.

Facts Not in Evidence: First, Tapia Rodriguez argues that an order in limine barred the prosecutor from eliciting testimony about Albarran Varona's fear of reprisal for testifying against Tapia Rodriguez and Gutierrez, that the prosecutor was prohibited from asking a question during trial that elicited such testimony, and that the prosecutor, nevertheless, argued Albarran Varona's fear during closing argument. This is not an accurate representation of the record.

The record shows the trial court *denied* Tapia Rodriguez's motion in limine to bar Albarran Varona's former defense attorney, Smitty Hagopian, from testifying that he contacted the Washington Department of Corrections on his client's behalf to allay his client's concerns about testifying. Moreover, the record shows defense counsel, not the

22

prosecutor, elicited testimony from Hagopian that formed the basis for the State's closing

argument. During cross-examination, Tapia Rodriguez's counsel asked Hagopian how he

prepared Albarran Varona for his free talk and, in relevant part, elicited the following

response:

> Secondly, with respect to these—your specific question, how do you prep your client for a free talk, in [Albarran Varona's] case, *we had to get over the hurdle of him knowing that he was going to be killed if he talked*, and get him to the point where he would understand that it is better for him, legally better for him, to take the risk of telling on his co-defendants, than it was for him to just do down with the ship, as it were.

RP at 1042 (emphasis added). Based on this testimony, the prosecutor argued in closing

that Albarran Varona was risking "a shiv in the back" by becoming a State's witness and

was scared to testify:

> So he has a hard choice to make. He can cooperate with us and get 18 years, but he takes a risk when he does that, he's going to get a shiv in the back. And that's what he's really scared of.
> The difference between 18 years and life doesn't mean a whole hell of a lot if you're dead, if you've been stabbed in the back in prison. That's a decision he's got to make. And that's not an easy decision at all. It takes a long time to sort that out. It's probably a harder decision than any of us will have to make in our lives. He put himself there.

RP at 2844. A prosecutor should not comment on matters outside the evidence. *State v.*

*Schlichtmann*, 114 Wn. App. 162, 58 P.3d 901 (2002). However, the State argued the

facts in evidence—facts the prosecutor did not elicit in violation of an order in limine.

Tapia Rodriguez cannot establish misconduct.

23

Vouching: Tapia Rodriguez insists the prosecutor vouched for Albarran Varona's veracity during closing argument:

> He said, I was the driver in the car, I shot Rafa. Why would he say that if it wasn't true?
> We also held back details. We held back about the fight in the car. We held back about biting and choking. That was on purpose. To test his credibility, to test whether he was going to tell us the truth.

RP at 2704. He argues that it is improper for the State to vouch for a government witness's credibility, such as when it places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. *See State v. Smith*, 162 Wn. App. 833, 849, 262 P.3d 72 (2011).

Tapia Rodriguez does not explain how this closing argument shows the State vouched for Albarran Varona or identify what information mentioned in the challenged closing argument was not presented to the jury. Albarran Varona testified that he shot Cano Barrientos. And extensive questioning of Hagopian elicited detailed testimony about what State information Albarran Varona did and did not have at the time of his free talk with law enforcement. While it is misconduct for a prosecutor to state a personal belief as to a witness's credibility, the prosecutor has wide latitude to argue inferences from the facts concerning witness credibility. *State v. Allen*, 176 Wn.2d 611, 631, 294 P.3d 679 (2013).

24

When viewed in context, the prosecutor did not express a personal opinion about Albarran Varona's credibility. The prosecutor's closing argument was made in the context of the State's encouragement that the jury should "[c]ross-check your evidence"—that is, compare the evidence and testimonies of various witnesses when determining credibility. RP at 2698. This was appropriate argument, not misconduct.

Misleading Argument: Finally, Tapia Rodriguez argues that the prosecutor misstated the evidence by claiming that .45-caliber casings recovered by law enforcement were from Tapia Rodriguez's gun. The prosecutor misstated what constitutes premeditation versus extreme indifference. And the prosecutor conflated Cano Barrientos's kidnapping with Sosa's kidnapping when discussing special verdict forms 5 and 11. He contends in conclusory fashion that conflating these matters prejudiced the jury's understanding of which form applied to which offense and which victim.

Again, the State has wide latitude to argue reasonable inferences from the evidence. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Here, the State produced evidence at trial that Tapia Rodriguez was armed with a .45-caliber handgun during the crimes against Sosa and Cano Barrientos, Sosa was shot with .45-caliber bullets, Tapia Rodriguez picked up shell casings from Cano Barrientos's vehicle, and a .45-caliber shell casing was recovered from Tapia Rodriguez's vehicle. The State's

argument that the .45-caliber shell casings were from Tapia Rodriguez's gun was a reasonable inference based on the evidence.

A prosecutor should not misstate the law. *Schlichtmann*, 114 Wn. App. 162; *State v. Huckins*, 66 Wn. App. 213, 836 P.2d 230 (1992); *State v. Browning*, 38 Wn. App. 772, 689 P.2d 1108 (1984). However, Tapia Rodriguez does not argue how the State misstated the differences between premeditation and extreme indifference. The court's instructions to the jury defined these legal terms and instructed the jury to disregard any statement by the lawyers that was not consistent with its instructions. Tapia Rodriguez fails to establish misconduct or resulting prejudice.

Likewise, the court's instructions to the jury were clear about the crimes to which they applied, ameliorating any confusion that may have been caused by the prosecutor's closing argument. Special verdict form 5 concerned the first degree kidnapping charge. The court instructed the jury about how to use it. The to-convict instruction for first degree kidnapping expressly mentioned Cano Barrientos, alleviating any confusion that special verdict form 5 also applied to the kidnapping charge concerning Cano Barrientos. Similarly, special verdict form 11 concerned the aggravated first degree murder charge. The evidence identified only one murder victim—Sosa. Tapia Rodriguez fails to show the prosecutor committed misconduct and specifically fails to establish flagrant and ill-intentioned misconduct.

26

No. 37522-6-III
*State v. Gustavo Tapia Rodriguez*

Affirm, but remand for resentencing and correction of scrivener's error.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_Lawrence-Berrey, A.C.J._
Lawrence-Berrey, A.C.J.

WE CONCUR:

_Siddoway, J.P.T._
Siddoway, J.P.T.[6]

_Staab, J._
Staab, J.

---

[6] Judge Laurel Siddoway was a member of the Court of Appeals at the time oral argument was heard on this matter. She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.